BANCO NACIONAL de CUBA, Appellant,

v.

The FIRST NATIONAL CITY BANK OF NEW YORK, Appellee.

Nos. 480 and 481, Dockets 32533 and 33864.

United States Court of Appeals, Second Circuit.

Argued March 23, 1970.

Decided July 16, 1970.

Victor Rabinowitz, New York City (Rabinowitz, Boudin & Standard, Leonard B. Boudin, and Kristin Booth Glen, New York City, on the brief), for appellant.

Henry Harfield, New York City (Shearman & Sterling, Wm. Harvey Reeves, and John J. Madden, Jr., New York City, on the brief), for appellee.

Walter J. Neylon, New York City, on the brief, for Alicio Ruiz Martinez, Sr., and others, intervenors.

Before LUMBARD, Chief Judge, HAYS, Circuit Judge, and BLUMENFELD, District Judge.*

LUMBARD, Chief Judge:

Plaintiff-appellant Banco Nacional de Cuba appeals from an order of the District Court for the Southern District of New York which granted summary judgment to defendant-appellee First National City Bank of New York (First National City) on Banco Nacional's two causes of action. Appellant has abandoned the second cause of action on this appeal, and thus only the first cause of action, which is based on the following facts, is before us on this appeal. First National City, when the Castro government of Cuba expropriated its properties there, forthwith sold collateral securing a loan it had made to Banco Nacional prior to the change in Cuba's government. The effect of Judge Bryan's order was to allow First National City to retain, as an offset against the value of its expropriated properties, the amount by which the proceeds from the sale of the collateral exceeded the amount then owing on the loan. We hold that allowing such an offset was error. The so-

* Sitting by designation.

called Hickenlooper Amendment does not give to a lender such as First National City the right to apply assets under its control to recoup losses it has suffered by expropriation of its properties in Cuba. Accordingly, we reverse and remand to the district court for a factual finding as to the amount of the excess. Once this factual determination is made, we direct entry of summary judgment in favor of Banco Nacional on its first cause of action.

## I.

On July 8, 1958, First National City made a fifteen million dollar secured loan to Banco de Desarrallo Economico y Social (Bandes), a corporate agency of the government of the Republic of Cuba. Collateral for the loan was pledged by Banco Nacional de Cuba (Banco Nacional) and another Cuban government agency, Fondo de Estabilizacion de la Moneda (Fondo); this security was held in New York and consisted of bonds of the United States government and obligations of the International Bank of Reconstruction and Development.

The Castro forces seized control of the government of Cuba on January 1, 1959. Thereafter, on July 8, 1959, First National City renewed the fifteen million dollar loan to Bandes for another year. During the course of the ensuing year, two Cuban laws went into effect which resulted in the dissolution of Bandes and the succession by Banco Nacional to many of its rights and obligations, including the obligation to repay the fifteen million dollars, plus interest, to First National City. The Republic of Cuba also guaranteed that the loan would be repaid.[1]

First National City and Banco Nacional renegotiated the loan for the second time on July 7, 1960. Banco Nacional repaid one-third of the loan—five million dollars—and First National City released approximately one-third of the collateral. At Banco Nacional's request, First National City agreed not to demand repayment of the ten million dollar balance for one year.

On September 16, 1960, the Cuban militia occupied the eleven First National City branch offices in Cuba. Executive Power Resolution No. 2, issued by the Castro government the following day, formally confirmed that the branches had in fact been nationalized.[2]

First National City retaliated almost immediately. On September 20, 1960, it notified Banco Nacional that it had closed Banco Nacional's accounts as of September 17 and that it was claiming the amounts on deposit therein as an offset against the nationalization of its properties in Cuba.[3] What is more important to the present appeal, on September 21 and 22, 1960, First National City sold the collateral held in New York as security on the ten million dollar loan. First National City received from that sale an amount—conceded to be at least $11,892,448 and perhaps as much as $12,412,000—which was substantially in excess of that required to discharge the ten million dollar principal sum and the interest thereon at the annual rate of 4 per cent for the period July 8, 1960, through the time of the sale.

## II.

Banco Nacional instituted suit in November, 1960, against First National City to recover the excess realized on

---

1. The district court cited these laws as Cuban Law No. 730, February 16, 1960, and Cuban Law No. 847, June 30, 1960.

2. Executive Power Resolution No. 2 was issued pursuant to Cuban Law No. 851, July 6, 1960. See Banco Nacional De Cuba v. Sabbatino, 307 F.2d 845, 849, 861–862 (2d Cir. 1962). Executive Power Resolution No. 2 is set out in the opinion of the district court, 270 F.Supp. at 1009–1010, note 6.

3. What had happened was that a number of private Cuban banks with deposits in First National City were nationalized pursuant to Cuban Law No. 891 in October 1960, and the confiscation decree declared that Banco Nacional was to have full title to the property of those banks. Thus, First National City, in notifying Banco Nacional, referred to the accounts as Banco Nacional's.

the sale of the collateral held as security for the loan. Its complaint also set forth a second cause of action for recovery of the deposits of the Cuban banks which First National City had retained. As Judge Bryan described it, First National City's answer raised "a series of defenses, set-offs and counterclaims based principally on the confiscation of First National City's Cuban branches." 270 F.Supp. at 1005. Both parties moved for summary judgment on both causes of action and on the counterclaims.

As to the second cause of action, Judge Bryan granted First National City's motion for summary judgment. Banco Nacional filed a notice of appeal from that portion of his order, but is not pressing that appeal at this time.[4] In dealing with the first cause of action, Judge Bryan denied Banco Nacional's motion for summary judgment on its claim and on First National City's counterclaim. However, as to defendant First National City's motion for summary judgment on the first cause of action and the counterclaim, Judge Bryan ruled:

> "Defendant's motion for summary judgment on the first claim is denied since there are triable issues of fact and law with respect to the amount of defendant's set-off. However, I hold that defendant is entitled to set-off as against [Banco Nacional's] first claim for relief any amounts due and owing to it from the Cuban Government by reason of the confiscation of First National City's Cuban properties."

270 F.Supp. at 1011.

It is this latter holding that is before us on this appeal. After Judge Bryan's order was filed, the parties entered into a stipulation providing that the value of First National City's property which had been confiscated in Cuba exceeds any amount which Banco Nacional could be awarded on its first cause of action to recover from First National City the excess amount realized on the sale of the collateral.[5]

### III.

First National City claims that it is entitled to retain the excess amount realized on the foreclosure of the collateral as a set-off because the Cuban government confiscated its branch banks without providing adequate compensation, and that this act was a violation of international law. Judge Bryan properly observed that under the United States Supreme Court's decision in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), "inquiry into the legality *vel non* of the expropriations here involved would be foreclosed by the act of state doctrine which forbids the courts of one country from sitting 'in judgment on the acts of the government of another, done within its own territory.'" 270 F.Supp. at 1007. However, Judge Bryan then concluded that the *Sabbatino* decision had been legislatively overruled "for all practical purposes," by the Hickenlooper Amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370(e) (2), as amended, 79 Stat. 658–59 (Sept. 6, 1965).

---

4. We only observe that Judge Bryan's resolution of this issue was in compliance with the decision of this court in Republic of Iraq v. First National City Bank, 353 F.2d 47 (2d Cir. 1965), cert. den., 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1960). We also note that the holding that the Cuban expropriation decrees are not entitled to extraterritorial enforcement in United States courts as to property located within the United States is distinct from the question whether the act of state doctrine—absent the Hickenlooper Amendment—bars an American court from inquiry into the validity

of expropriations of American property within the territory of the expropriated nation.

On this appeal, certain intervenors point out that they claim some of these deposits. The court below, in granting summary judgment to First National City on Banco Nacional's second cause of action, did not reach these claims, which we assume will be litigated below at some time.

5. This stipulation was entered for purposes of this litigation, to avoid the necessity of a trial on the value of First National City's expropriated assets located in Cuba. See 270 F.Supp. at 1010–1011.

He also noted that the Hickenlooper Amendment had been held constitutional in the Southern District of New York in the sequel to the *Sabbatino* litigation, Banco Nacional de Cuba v. Farr, 243 F. Supp. 957 (S.D.N.Y.1965); we add that the district court decision in *Farr* was affirmed in a lengthy opinion by Judge Waterman, 383 F.2d 166 (2d Cir. 1967), and that Banco Nacional's petition for a writ of certiorari in that case was denied, 390 U.S. 956, 88 S.Ct. 1038, 20 L. Ed.2d 1151 (1968).

Judge Bryan also held that the Hickenlooper Amendment directed him, regardless of the act of state doctrine, to determine "the merits in cases involving a confiscation after January 1, 1959, by an act of a foreign state 'in violation of the principles of international law, including the principles of compensation.'" 270 F.Supp. at 1007. Proceeding to the merits, Judge Bryan held that the confiscation of First National City's branches did violate international law because adequate compensation was not provided and because the confiscation was a reprisal evincing discrimination against nationals of the United States, 270 F.Supp. at 1007–1010. In light of this, he concluded that First National City was entitled to a set-off against Banco Nacional's claim to recover the amount left from the sale of the collateral after deduction of the principal and interest due and owing.

On this appeal, Banco Nacional makes three principal arguments. First, it claims that the act by which the Cuban government confiscated First National City's branches in Cuba was an act of state, that the Hickenlooper Amendment is not applicable to the facts in this case, and thus that the district court should have followed Mr. Justice Harlan's opinion for the Court in *Sabbatino* and not inquired into the validity of the Cuban expropriation under international law.[6] Second, Banco Nacional argues that the Hickenlooper Amendment is unconstitutional.[7] Third, Banco Nacional contends, with some justification, that summary judgment on First National City's counterclaim was improper because: (1) the counterclaim was invalid procedurally in that it was directed at the Republic of Cuba, which is not an "opposing party" in the present suit under Rule 13 of the Federal Rules of Civil Procedure and the interpretations of that rule; or (2), assuming the counterclaim to be proper procedurally, Banco Nacional is not in fact liable for the obligations of the Republic of Cuba; or (3) because at the very least this latter question raised a triable issue of fact which was improperly resolved on a motion for summary judgment. Since we agree with Banco Nacional's first argument, we find it unnecessary to pass on the other contentions.

### IV.

Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964)[8] laid down a rule of federal law by which this court and all other courts are bound absent subsequent changes in the rule wrought by Congress or by the Supreme Court. In the course of his exhaustive opinion for the eight-member majority of the Court, Mr. Justice Harlan devoted considerable attention to the general problem of when domestic courts should decline to pass upon claims which draw into question the va-

---

**6.** A sub-part of this argument is that, assuming the Hickenlooper Amendment applies to the facts of this case, Judge Bryan incorrectly applied international law in holding that the Cuban expropriations violated international law. However, appellant concedes that if this court holds the Amendment applicable to the case at bar, Judge Bryan's decision on this issue was in accordance with the decision of this court in Banco Nacional v.

Farr, *supra*, 383 F.2d at 183–185; appellant states that it raises the issue only to preserve it for further appeal.

**7.** Again, this issue was resolved against Banco Nacional in Banco Nacional de Cuba v. Farr, *supra*, 383 F.2d at 178–183.

**8.** Reversing Banco Nacional de Cuba v. Sabbatino, 307 F.2d 845 (2d Cir. 1962).

lidity of the acts of foreign sovereign states. He observed that the

> "continuing vitality [of the act of state doctrine] depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs. It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."

376 U.S. at 427–428, 84 S.Ct. at 940.

From this general discussion, Mr. Justice Harlan's opinion proceeds to a specific consideration of the problem posed when the courts of one nation purport to examine the validity under international law of another nation's expropriation of the property of foreign nationals. Examining the state of the international law on this question, the Court concluded that there was no extant definition of the limits of such power which could command anything approaching a substantial majority of informed opinion. *Id.* at 428, 84 S.Ct. 923. After canvassing some of the basic disagreements on the question,[9] the Court stated that "[i]t is difficult to imagine the courts of this country embarking on an adjudication in an area which touches more sensitively the practical and ideological goals of the various members of the

community of nations." *Id.* at 430, 84 S.Ct. at 941.

The Court's opinion also stressed that it is far wiser for the courts to defer to the Executive in the task of securing some form of compensation for citizens of the United States who have lost property through expropriation by a foreign state. The Executive can often achieve some form of general redress, whereas judicial determinations can have only an occasional impact.[10] Moreover, judicial

> "decisions would, if the acts involved were declared invalid, often be likely to give offense to the expropriating country; since the concept of territorial sovereignty is so deep seated, any state may resent the refusal of the courts of another sovereign to accord validity to acts within its territorial borders. Piecemeal dispositions of this sort involving the probability of affront to another state could seriously interfere with negotiations being carried on by the Executive Branch and might prevent or render less favorable the terms of an agreement that could otherwise be reached. Relations with third countries which have engaged in similar expropriations would not be immune from effect."

*Id.* at 431–432, 84 S.Ct. at 942. Mr. Justice Harlan also dismissed the argument that American courts should examine the validity of foreign expropriations because in doing so they would make an important contribution to the development of international law as based on "the sanguine presupposition that the decisions of the courts of the world's major capital exporting country and principal exponent of the free enterprise system would be accepted as disinterested expressions of sound legal principle by those adhering to widely different ideologies." 376 U.S. at 434–435, 84 S.Ct. at 943.

Accordingly, the Court held "that the Judicial Branch will not examine the validity of a taking of property within its

---

9. 376 U.S. at 429–430, 84 S.Ct. 923.

10. See section VI, *infra.*

own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law." *Id.* at 428, 84 S.Ct. at 940. There can be no doubt that the confiscation of First National City's branch offices in Cuba by the Cuban government was such a taking of property. As such it is an act of state the validity of which the Court has directed the Judicial Branch not to examine.

### V.

The analysis just presented would suffice to decide this appeal but for the enactment of the Hickenlooper Amendment by Congress. The amendment, sometimes described during the Congressional debates as the "Sabbatino Amendment," [11] was passed in 1964, shortly after the Supreme Court rendered its decision in *Sabbatino*, and that fact is important in interpreting the language Congress used. In pertinent part, the Hickenlooper Amendment now provides:

"(2) Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection * * *."

Judge Bryan held that the Hickenlooper Amendment overruled the *Sabbatino*

decision "for all practical purposes" and that he was therefore required to disregard the act of state doctrine and to pass on the validity of the expropriations of First National City's branches in terms of international law. Banco Nacional takes the position that Judge Bryan's reading of the Hickenlooper Amendment is far too broad. We agree.

To understand the legislative history upon which Banco Nacional relies, it is necessary to sketch briefly the facts of *Sabbatino* itself. The case involved a shipment of Cuban sugar which was to have been purchased by an American commodity broker, Farr, Whitlock & Co., from the Cuban subsidiary of an American owned firm, C.A.V. Before the shipment could leave Cuba, all of the C.A.V.'s assets in Cuba were expropriated. Thereafter, the Cuban government allowed the shipment of sugar to leave Cuba, but only after Farr, Whitlock had entered into contracts, identical to its earlier agreement with C.A.V., with Banco Para Commercio Exterior de Cuba (Banco Exterior), an instrumentality of the Cuban government. The ship carrying the sugar was then allowed to sail from Cuba to Morocco. Banco Exterior assigned the bills of lading to Banco Nacional, which in turn assigned them to Societe Generale, a French bank which acted as Banco Nacional's agent in New York, for presentation to Farr, Whitlock for payment. In some manner, Farr, Whitlock obtained possession of the bills of lading from Societe Generale without making payment upon presentation. The money which Farr, Whitlock was supposed to pay for the shipment was also claimed by C.A.V. Thus, the dispute over the right to the proceeds of the sale of the expropriated shipment of Cuban sugar was between Banco Nacional, which in the words of the Hickenlooper Amendment claimed "title or other right * * * based upon (or traced through)

11. See e. g., Hearings before the Senate Committee on Foreign Relations on S. 2659, S. 2660, S. 2662, and H.R. 11380, 88th Cong., 2d Sess. (1964) at 449; Hearings before the House Committee on Foreign Affairs on H.R. 7750, 89th Cong., 1st Sess. (1965).

a confiscation," and C.A.V., an American-owned firm which had owned the sugar before the expropriation.

*Sabbatino* was handed down by the Supreme Court in March, 1964, and in April, 1964, Senator Hickenlooper proposed the initial version of a foreign aid bill amendment related to the case in the Foreign Relations Committee.[12] A Conference Committee rewrote the language in September, 1964, and the amended version was enacted on October 7, 1964, as section 301(d) (4) of the Foreign Assistance Act of 1964. Pub.L. 88–633, 78 Stat. 1009, 1013. It was changed slightly and re-enacted in its present form on September 6, 1965, as section 301(d) (2) of the Foreign Assistance Act of 1965. Pub.L. 89–171, 79 Stat. 653, 22 U.S.C. § 2370(e) (2).[13]

It is evident from the proceedings in Congress relating to the Hickenlooper Amendment that Congressmen and others were quite concerned about the problem peculiarly related to the facts of the *Sabbatino* case. At the time of the Congressional debates during 1964 and 1965, virtually all American-owned property in Cuba had been nationalized. Much of this property consisted of productive installations such as sugar plantations, fertilizer plants, mines, and oil production facilities. In light of this, when the Supreme Court in *Sabbatino* issued a ruling which would apparently permit Banco Nacional to prevail over an American-owned firm in securing the proceeds of the sale of a shipment of expropriated sugar to an American commodity broker, the phrase "thieves' market for expropriated property" came into vogue. In explaining this proposal in an

August, 1964, letter to the Washington Post, Senator Hickenlooper used the term "thieves' market," and explained further that the Amendment's purpose was to require American courts to apply international law "whenever expropriated property comes within the territorial jurisdiction of the United States." 110 Cong.Rec. 19548. At another time, he said "Basically the amendment is designed to assure that the private litigant is granted his day in court." 110 Cong. Rec. 18936. The Senator further explained:

> "[The amendment] will discourage foreign expropriation by making sure that the United States cannot become a 'thieves' market' for the product of foreign expropriations.

> \*　\*　\*　\*　\*　\*

> One of the principal reasons for the proposed amendment is that it will serve notice that foreign states taking action against U. S. investment in violation of international law cannot market the product of their expropriation in the United States free from litigation."

110 Cong.Rec. 19555, 19559 (1964). See also *Id.*, 19548, 19557.

When the Conference Committee reported the Amendment to the House of Representatives on October 2, 1964, Congressman Adair, its sponsor in the House, gave this explanation of its purpose:

> "It insures that however the case may arise or the act of state doctrine be invoked, a party who had suffered an expropriation in violation [of international law] *may bring suit to assert his claim to the expropriated*

---

12. "No court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits, or to apply principles of international law including the principles of compensation and the other standards set out in this subsection, in a case in which an *act* of a foreign state occurring after January 1, 1959 is alleged to be contrary to international law, and effect shall not be given by the court in any such case to *acts* that are found to be in

violation thereof." (S.Rep. No. 1188, Part I, 88th Cong., 2d Sess. [1964], p. 37; emphasis added.)

13. For a discussion of these changes see Banco Nacional de Cuba v. Farr, *supra*, 383 F.2d at 171–172, and at 171, note 5. See also Chief Judge Fuld's discussion in French v. Banco Nacional de Cuba, 23 N.Y.2d 46, 59–62, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968).

*property if there is an attempt to market it in the United States* or can resist a suit by the expropriating government to seize the property."

110 Cong.Rec. 23680 (1964) (emphasis added). Senator Hickenlooper described the provision in virtually identical terms in the Senate the following day. See 110 Cong.Rec. 24076–77 (1964).

The Hickenlooper Amendment was further considered in the 89th Congress during 1965, particularly in hearings held by the House Committee on Foreign Affairs on its reenactment. The first witness at these hearings was Professor Cecil Olmstead, one of the original authors of the Hickenlooper Amendment, who represented the Rule of Law Committee—formed by a group of American companies which had suffered expropriations—in its support for the Amendment. He first discussed *Sabbatino*, describing its effect as follows:

"* * * [I]f the former American owners of property expropriated abroad seek to recover that property when it turns up within the United States they are denied any kind of recourse to U.S. courts, both State and Federal, even in cases in which the expropriation is uncompensated. * * Specifically, this means that the fruits of such illegal expropriation could be marketed with impunity in the United States."

Hearings before the House Committee on Foreign Affairs on H.R. 7750, 89th Cong., 1st Sess. 578 (1965). See also *Id.* 579, 591, 592, 598–599, 601, 604–605, 612–615.

During Professor Olmstead's testimony, an instructive colloquy took place between Olmstead and Congressman Fraser, a member of the Committee. Mr. Fraser was interested in determining how broad the Amendment was. He asked:

"For example, supposing that country X expropriates some property and doesn't compensate for it and then a property belonging to the foreign state comes into the hands of an American citizen within this country so that they bring an action, they attach the property and bring an action in the U.S. courts alleging that this government has wronged them by expropriating their property, but the property they have attached is not the property that was expropriated, nevertheless they make the claim they are entitled to compensation and the defense, I assume, by the country involved is that they had a right to expropriate.

Does that situation come within the language of your amendment?

Mr. Olmstead: No, sir; that would not come within it. Our amendment has no provision in its scope to apply to property other than that actually expropriated *by the foreign country itself.*"

\*     \*     \*     \*     \*     \*

Mr. Fraser: You are saying it would be limited solely to situations where you actually—where what [was] at issue was the title of the [expropriated] property, that is the major issue?

Mr. Olmstead: Yes."

There followed a page of discussion about ore or oil from an expropriated mine or well coming back into this country, and Professor Olmstead then concluded: "Of course this amendment will only operate when *some proceeds of the illegal expropriation turn up in the United States,*" *id.* at 607–608 (emphasis added).

Attorney General Katzenbach, who testified before the same Committee the day after Professor Olmstead, took the same view. In his opening remarks in opposition to the Amendment he stated:

"What are we talking about in this amendment? We are talking about a very isolated, infrequent occurrence which is when American property that has been nationalized in some way or another finds its way back in the United States. That is very unlikely to occur. * * * It is generally an accident because the owner of that property, or the foreign government

involved, is not going to bring that property into this country and is deterred from doing it by the fact that normally, if that property is brought into this country, the assets from it are going to be frozen in an outstanding dispute with the foreign country."

House hearings, *supra*, at 1235. See also, *id.* 1236, 1237 (testimony of Mr. Katzenbach).

Congressman Gross, another member of the House Foreign Affairs Committee, urged that the Amendment be broadened to enable the owner of expropriated property to seize Cuban property in the United States as an offset for the value of property seized by Cuba. See House Hearings, *supra*, at 1249; see also *id.*, at 1050. As appellant Banco Nacional points out, this is precisely the position First National City takes in this litigation. However, First National City has cited no legislative history, and we have found none, which indicates that Mr. Gross' suggestion was thought to have been adopted by Congress when it reenacted the Hickenlooper Amendment.

Banco Nacional quotes the following colloquy between Mr. Katzenbach and Representative Gallagher of the House Foreign Affairs Committee as indicative of the legislators' and witnesses' understanding of the scope of the Amendment:

"Mr. Gallagher: This amendment merely applied to property that works its way back into the United States; correct?

Attorney General Katzenbach: Yes.

Mr. Gallagher: That it has no effect whatsoever on any property that continues to rest or vest in the country that made the seizure?

Attorney General Katzenbach: That is correct."

House Hearings, *supra*, at 1247. See also colloquy between Mr. Katzenbach and members of the Committee, *id.* at 1245–1247; colloquy between Professor Henkin and Mr. Gallagher, *id.* at 1072; testimony of Professor Metzger, *id.* at 1025–1031; testimony of Professor McDougal, *id.* at 1043, 1050–1051; statement of the Committee on International Law of the Association of the Bar of the City of New York submitted to the House Foreign Affairs Committee in support of the Amendment, *id.* at 1316. See also Hearings before the Senate Committee on Foreign Relations on the Foreign Assistance Program, 89th Cong., 1st Sess. 728 (1965) (letter to Chairman Fulbright from George W. Ball); id. at 730–760 (an appendix consisting of material submitted by Senator Hickenlooper, much of it from the earlier House hearings).

Given all of this background, we can find no basis for holding that the present case is one "in which a claim of title or other right to property is asserted by [First National City] * * * based upon (or traced through) a confiscation or other taking * * *." 22 U.S.C. § 2370(e) (2). To do so would stand the statute on end. If one fact is clear from the legislative history, it is that this language was designed to be invoked by American firms in order to afford them "a day in court"—and presumably a monetary recovery—when some other entity attempted to market the American firms' expropriated property and some aspect of such an attempted transaction took place in this country. We cannot believe that through the same language Congress intended to create a self-help seizure remedy for those few American firms fortunate enough to hold or have access to some assets of a foreign state at the time that state nationalizes American property.[14]

14. See French v. Banco Nacional de Cuba, 23 N.Y.2d 46, 57–58, 295 N.Y.S.2d 433, 444, 242 N.E.2d 704, 712 (1968). Chief Judge Fuld there states: "It is plain enough from the face of the [Hickenlooper Amendment]—and abundantly clear from its legislative history—that Congress was not attempting to assure a remedy in American courts for every kind of monetary loss resulting from actions, even unjust actions, of foreign governments. The law is restricted, manifestly, to the

## VI.

Indeed, it seems to us that such an interpretation of the Hickenlooper Amendment would run counter to another important Congressional policy.

Through the provisions of Subchapter V of the International Claims Settlement Act of 1949, Pub.L. 88–666, 78 Stat. 1110, amended Oct. 19, 1965, Pub.L. 89–262, § 1, 79 Stat. 988; Nov. 6, 1966, Pub.L. 89–780, § 1, 80 Stat. 1365, 22 U.S.C. §§ 1643–1643k (1970 Supp.), on October 16, 1964, Congress provided for "the determination of the amount and validity of claims against the Government of Cuba \* \* \* [arising] out of nationalization expropriation, intervention, or other takings of \* \* \* property of nationals of the United States \* \* \*." 22 U.S.C. § 1643 (1970 Supp.). Obviously, the expropriation of First National City's branches in Cuba gave rise to a claim of the sort which Congress intended to be submitted to the Foreign Claims Settlement Commission. See 22 U.S.C. § 1643b(a) (1970 Supp.).

On the other hand, Congress and the Executive Branch have also acted, pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5 (1970 Supp.); Proc. 3447, 27 Fed.Reg. 1085, 3 C.F.R., 1959–1963 Comp., to block all Cuban assets present in this country as of July 8, 1963. See 31 C.F.R. §§ 515, et seq. (1970).[15] At present there is no provision in the federal statutes or regulations providing for vesting of the blocked Cuban assets—whether assets of the Cuban government or of Cuban nationals—in the government of the United States for sale and use by the Foreign Claims Settlement Commission to pay those who have submitted claims to the Commission based on expropriations by the Cuban government.[16]

---

kind of problem exemplified by the *Sabbatino* case itself, a claim of title or other right to specific property which had been expropriated abroad." See also Henkin, Act of State Today: Recollections in Tranquility, 6 Col.J. of Transnational Law, 175, 184–185 (1967); *see also id.* 185, n. 40.

15. The report of the Treasury Department, Office of Foreign Assets Control, on the census of blocked Cuban assets, is reprinted in House Hearings, *supra*, at 1264. The report states, as reprinted at 1264, that the Cuban assets control regulations were adopted "under section 5(b) of the Trading with the Enemy Act of 1917, as amended, to implement the policy of an economic embargo of Cuba set forth in Proclamation No. 3447, which was issued by the President under section 620 (a) of the Foreign Assistance Act of 1961, Public Law 87–195."

16. In 1964, when Congress enacted subchapter V of the International Claims Settlement Act of 1949, relating to claims against Cuba, it included as section 511 (b) a provision vesting the blocked assets of the Cuban government in the United States government and further providing that the proceeds of such assets of the Cuban government should be used to reimburse the United States government for the expense of operating the Foreign

Claims Settlement Commission and the Department of the Treasury in processing claims against Cuba. Pub.L. 88–666, section 511(b), 78 Stat. 1113 (October 16, 1964). However, that section was repealed one year later, see Pub.L. 89–262, section 5, 79 Stat. 1988 (October 16, 1965). The report of the Senate Foreign Relations Committee states that "the committee was persuaded by the following argument advanced by the Department of State:

'it is the Department's view that the vesting and sale of Cuban property could set an unfortunate example for countries less dedicated than the United States to the preservation of property rights. The Government of the United States, as a matter of policy, encourages the investment of American capital overseas and endeavors to protect such investments against nationalizations, expropriations, intervention, and taking. To vest and sell Cuban assets would place the Government of the United States in the position of doing what Castro has done. It could cause other governments to question the sincerity of the U. S. Government in insisting upon respect for property rights. The result could be a reduction, in an immeasurable but real degree, of one of the protections enjoyed by American-owned property around the world.'"

It is this system of claim submission and blocking of assets which First National City seeks to circumvent. Due to the Cuban expropriation of its branches, First National City felt justified in breaching whatever loan agreement it had entered with Banco Nacional on July 7, 1960, by prematurely foreclosing on the collateral held as security. It was fortunate for First National City that sale of the collateral brought more than enough money to cover the principal amount and interest then due on the loan. First National City was also fortunate in that it sold the security before Cuban assets were blocked in July, 1963. Had they waited, it seems clear, under 31 C.F.R. § 515.202 (1970), that any sale of the collateral put up by Banco Nacional as security on the loan in suit would have been impossible without a license from the Office of Foreign Assets Control of the Treasury Department. See 31 C.F.R. § 515.801 (1970). As matters now stand, First National City has recouped dollar-for-dollar on the loan transaction; by its position on this appeal, it seeks something more.

We do not believe that First National City has any special claim to the excess proceeds of the sale of the collateral. Any judgment rendered in favor of Banco Nacional on its first cause of action would, after deduction of attorney's fees, become a blocked Cuban asset.[17] Pre-sumably, if other attempts at settlement of the claims fail, the blocked Cuban assets will eventually be vested in the United States government and the Foreign Claims Settlement Commission will begin compensation of the claimants. As part of the pool of assets available for compensation, such a judgment in favor of Banco Nacional would serve to provide at least partial compensation of all those claimants who suffered losses in the Cuban expropriations. See testimony of Attorney General Katzenbach, House Hearings, *supra*, at 1235–1236. No authority which First National City has cited in its brief establishes any right to a preference such as that which would result if the decision of the district court were to be affirmed. While Judge Bryan noted in a footnote that "[a]ny sum which First National City is permitted to set-off in this action will, of course, have to be taken into account by the United States Foreign Claims Settlement Commission in assessing claims filed by First National City," 270 F.Supp. at 1011, note 10, we observe that such a set-off against its total claims with the Commission would still allow First National City a dollar-for-dollar recoupment on a significant portion of its total claim for the value of its expropriated property—something which few, if any, other claimants are likely to receive.[18]

Sen.R. No. 701, 89th Cong., 1st Sess., 2 U.S.C.Code Cong. & Admin.News p. 3583 (1965).

It seems to us that Congress' acceptance of the State Department's argument points up to some extent the wisdom of Mr. Justice Harlan's observation in *Sabbatino* that to permit American courts to pass on the validity of expropriations would have an effect on "[r]elations with third countries which have engaged in similar expropriations." 376 U.S. at 432, 84 S.Ct. at 942, 11 L.Ed.2d 804.

17. See Report of Treasury Department, Office of Foreign Assets Control, Census of Blocked Cuban Assets, *supra* note 15, reprinted in House Hearings, *supra*, at 1264.

First National City's judgment debt to Banco Nacional for the excess amount it holds would have to be reported to the Office of Foreign Assets Control on Form TFR–607 under any one of several classifications of "reportable property" specified on that form.

The report also states that the deadline for filing reports for the Office's census of blocked Cuban assets was March 15, 1964. However, the report notes that there are probably many people holding blocked assets who did not know of the deadline, and states "extensions of time for filing were granted when necessary." There is little question that an extension would be granted in a situation such as the present case, where lengthy litigation to settle the dispute over entitlement to the excess funds carried the parties past the filing deadline.

18. We note from the affidavit of First National City Bank submitted below that its claims for expropriated property is

### VII.

Since there is a factual dispute, to the extent of more than $500,000, between the parties as to the total amount realized from the sale of the collateral and as to the amount of interest properly deducted, which Judge Bryan was not called upon to resolve due to his disposition of the summary judgment motions, we remand to the district court for a determination of the exact amount of excess left after the principal sum and the interest due thereon is deducted from the proceeds of the sale of the security. When this determination is made, the district court is directed to grant Banco Nacional's motion for summary judgment on its first cause of action.

Reversed and remanded for further proceedings consistent with this opinion.

relatively small, about three million dollars, as compared to some claims which must have been filed by American corporations with large industrial operations in Cuba.

The windfall First National City seeks can best be understood through a hypothetical example. Assume that there are twenty claimants who have filed with the Foreign Claims Settlement Commission pursuant to 22 U.S.C. § 1643 (Supp. 1970). Ten claimants, called "A" claimants, each have claims for fifteen million dollars; nine claimants, called "B" claimants, each claim five million dollars. The twentieth claimant is First National City Bank which, for purposes of this example, also seeks five million dollars. Further, assume that absent the sum in dispute in this case the total value of blocked Cuban assets held by the Office of Foreign Assets Controls is 20 million dollars.

If the claims are eventually allowed to vest against the fund and some sort of pro rata payment authorized, First National City Bank will do considerably better if it is permitted to retain the Cuban assets which fortuitously were in its reach, rather than if it had merely held the excess here in dispute so that in time it would have been blocked and become part of the fund.

Assume First National City has seized the collateral, sold it, and realized three million dollars over the amount owed with interest. If, as it seeks in this suit, it keeps the three million as a set-off against its claims against Cuba, the fund comprised of all blocked assets would still equal twenty million dollars. However, the claims against the fund would be reduced from 200 million to 197 million, since First National City would have to off-set the three million dollars against the five million dollars we have assumed it has claimed with the Foreign Claims Settlement Commission. See 22 U.S.C. § 1643 (Supp.1970). On this basis, the pro rata share would be 10.15 cents on the dollar. The "A" claimants, seeking 15 million each, would each receive about 1.52 million; the "B" claimants, with claims for 5 million, would each take about .507 million. And First National City, with its claim reduced to 2 million, would receive, about .203 million. But to this must be added the 3 million which it took directly, bringing its total recovery to 3.203 million.

In the second case, First National has not (or is not allowed to) take the 3 million for its own account; rather, it stays in Banco Nacional's name and in time becomes part of the fund. Now, the fund has 23 million, while the claims are 200 million, since First National City has nothing to off-set against its initial claim of 5 million. Here, the pro rata share would be about 11.5 cents on the dollar. The "A" claimants would receive about 1.725 million each, while the "B" claimants—including First National City—would take about .575 million each.

As can be seen, by resorting to self-help and avoiding the Congressional scheme for orderly settlement of these claims, First National City stands to profit considerably. Under our hypothetical figures, the difference is between 3.24 million and .575 million dollars. The windfall of course is not at the expense of Cuba, but rather comes out of the shares of all other American nationals who have lost property by the Cuban expropriation.