**ETHIOPIAN SPICE EXTRACTION SHARE COMPANY, Plaintiff and Counter-Defendant,**

v.

**KALAMAZOO SPICE EXTRACTION COMPANY, Kalsec, Inc., and Kalsec International, Inc., Defendants, and Kalamazoo Spice Extraction Company, and Kalsec, Inc., Defendants and Counter-Plaintiffs.**

**KALAMAZOO SPICE EXTRACTION COMPANY, Plaintiff,**

v.

**The PROVISIONAL MILITARY GOVERNMENT OF SOCIALIST ETHIOPIA, Defendant.**

**Nos. K79–400 CA, K81–17 CA.**

United States District Court, W. D. Michigan, S. D.

July 6, 1982.

Jack Weinberg, New York City, Bert Burgoyne, Southfield, Mich., for Ethiopian Spice Extraction Share Co.

James R. Withrow, Jr., New York City, for Kalamazoo Spice Extraction Co., Kalsec, Inc. and Kalsec Intern. Co., Eric V. Brown, Sr., Kalamazoo, Mich., of counsel.

Thomas Carey, Kalamazoo, Mich., for Provisional Military Government of Socialist Ethiopia.

## OPINION

BENJAMIN F. GIBSON, District Judge.

These two cases arise out of the expropriation by the Ethiopian government of an interest in an Ethiopian corporation engaged in the production of spices. The expropriation is the basis of the complaint in K81–17 (Case Two) and is one of the grounds for a counterclaim resisting payment in K79–400 (Case One). This Opinion addresses five motions which are ripe for decision in the two cases.

The complaint in Case One contains claims by the Ethiopian corporation, known as the Ethiopian Spice Extraction Share Company (ESESCO), for goods sold and delivered, and for an account stated. The defendant is the Kalamazoo Spice Extrac-

tion Company (Kal-Spice), a Michigan corporation with whom ESESCO had been doing business. Their business relationship dates back to 1966, when Kal-Spice established ESESCO as a corporation under the laws of Ethiopia, with Kal-Spice owning approximately 80% of the shares of ESESCO. Kal-Spice then arranged financing, trained staff, and built a production facility with the alleged understanding that ESESCO would sell Kal-Spice its entire output of oleoresin spices each year. Production began in 1970 and the operation was profitable through 1975. On February 3, 1975, the Provisional Military Government of Socialist Ethiopia (PMGSE) expropriated a majority of the shares of ESESCO. Prior to that time, Kal-Spice had placed an order with ESESCO for the purchase of a certain quantity of oleoresin, which was delivered. By its amended complaint in Case One, ESESCO seeks to recover the purchase price for that order, an amount just under $2 million, plus interest, costs and attorneys' fees.[1]

The counterclaim filed by Kal-Spice in Case One asserts four separate claims against ESESCO. The first is for the expropriation of allegedly all of Kal-Spice's shares in ESESCO. The second alleges a wrongful deprivation of Kal-Spice's shareholder rights. The third alleges a violation of an agreement whereby ESESCO would sell its entire output to Kal-Spice, and the fourth alleges a wrongful appropriation and conspiracy to appropriate trade secrets. The damages sought in the counterclaims far exceed the relief sought by ESESCO's claim for the purchase price of oleoresin.

There are two pending motions related solely to Case One. Plaintiff ESESCO has moved for partial summary judgment, alleging that there is no genuine dispute over the amount owed by Kal-Spice on the oleoresin purchase. The other motion is brought by Kal-Spice, and seeks to have the PMGSE added in Case One as an indispensable party plaintiff, or in the alternative to have the PMGSE formally named as already being in fact a party plaintiff. This motion is premised on the argument that ESESCO and the PMGSE should be considered a single entity, because of the provisions of the Foreign Sovereign Immunities Act, and because their disregard of corporate formalities should result in a judicial disregard of ESESCO's corporate identity.

In Case Two, the complaint filed by Kal-Spice seeks damages from the PMGSE based on its expropriation of the ESESCO shares owned by Kal-Spice.[2] The PMGSE has filed a motion to dismiss this action, and Kal-Spice has moved to strike an affidavit filed in support of the motion to dismiss. Finally, there is a motion filed by Kal-Spice to consolidate the two cases.

The Court will first address the motion for partial summary judgment in Case One. The standard for summary judgment is contained in Fed.R.Civ.P. 56(c):

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

ESESCO has supported its motion with an affidavit and exhibits consisting of a purchase order dated October 18, 1974, bills of lading, invoices, and a statement of Kal-Spice to its auditors. In its answer to the amended complaint, Kal-Spice admits the material allegations relevant to ESESCO's claim for goods sold and delivered but denies it had an obligation to pay for the reasons set forth in its counterclaims. In its brief in opposition to the motion, Kal-Spice contends that any final judgment and

---

1. The amended complaint in Case One includes a Third Count which seeks to recover from Kalsec, Inc. and Kalsec International, Inc., alleging disregard of their separate corporate identities, operation with Kal-Spice as a single economic entity, and an intent to defraud ESESCO. There is also a Fourth Count alleging breach of an agreement concerning oleoresin testing methods.

2. The complaint in Case Two is essentially the same as the First Count of the counterclaim brought against ESESCO in Case One.

execution on the claim for goods sold and delivered would be inappropriate because of the related and unresolved counterclaims of Kal-Spice.

The Court is of the Opinion that there is no genuine dispute as to any of the facts material to ESESCO's claim against Kal-Spice for goods sold and delivered. However, there are clearly genuine issues of material fact relevant to the counterclaims and to ESESCO's other claims in its amended complaint. Fed.R.Civ.P. 56(d) provides for circumstances such as these:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Therefore, an order "specifying the facts that appear without substantial controversy" accompanies this Opinion.[3]

■ It has been requested by ESESCO that Kal-Spice be ordered to provide a bond or payment into the registry of the Court of an amount sufficient to satisfy the principal and interest due on ESESCO's claim for goods sold and delivered. No authority in support of such request has been submitted, but documents have been filed suggesting that Kalsec, Inc. was formed, and assets were transferred to it from Kal-Spice, in order to limit the potential liability in any suit against Kal-Spice. ESESCO's reply affidavit and documents fail to even suggest that any further action can or will be taken by Kal-Spice which might endanger ESESCO's ability to collect on any eventual judgment in its favor. They merely demonstrate that Kal-Spice has already taken action which, if legally valid, may have affected ESESCO's ability ultimately to collect a judgment. Given the possibility that Kal-Spice may prevail on its counterclaims and receive a judgment in an amount which would more than offset ESESCO's damages, the Court is of the opinion that the requested bond or payment should not be required.

Because of the interrelationship among the pending motions, the Court next turns to the motion to dismiss filed by the PMGSE in Case Two. The PMGSE contends in its motion and brief in support that it is immune under the Foreign Sovereign Immunities Act; that there are no minimum contacts with the state of Michigan sufficient to establish personal jurisdiction; that the action is barred by the act of state doctrine; and that venue would be proper only in the District of Colombia. As set forth more fully below, the Court finds the act of state doctrine to be dispositive of this motion.

The classic American statement of the act of state doctrine can be found in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained by the means open to be availed of by sovereign powers as between themselves.

---

3. Fed.R.Civ.P. 54(b) deals with "entry of a final judgment as to one or more but fewer than all of the claims" when more than one claim or counterclaim is presented in an action. Kal-Spice has presented substantial arguments against its application here. Although the Court notes that the drafters intended this exception to the general rule against piecemeal disposal of litigation and appeals to be applied only in the infrequent harsh case, the Court need not decide the question since ESESCO has made no request for a Rule 54(b) determination.

The Supreme Court in that case refused to inquire into acts of Hernandez, a revolutionary Venezuelan military commander whose government had been later recognized by the United States. Those acts had become the basis of a damage action in this country by Underhill, an American citizen, who claimed that he had been unlawfully assaulted, coerced, and detained by Hernandez. The Court affirmed a directed verdict for Hernandez on the basis of the act of state doctrine.

More recently, the Supreme Court addressed the act of state doctrine in *Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), one of many cases arising out of the Cuban Revolution. In this case the official bank of Cuba sued to recover the proceeds of a shipment of sugar which had been expropriated by the Cuban government while the sugar was still in Cuba, and the defendant interposed a counter-claim asserting the invalidity of the expropriation. The Court ruled that,

> [T]he Judicial Branch will not examine the validity of the taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

376 U.S. at 428, 84 S.Ct. at 940.

In response to the *Sabbatino* decision, Congress passed the "Hickenlooper Amendment," 22 U.S.C. § 2370(e)(2), which bars application of the act of state doctrine to confiscations carried out in violation of international law.[4]

The Supreme Court again addressed the act of state doctrine in *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 *reh. denied*, 409 U.S. 897, 93 S.Ct. 92, 34 L.Ed.2d 155 (1972). In that case the official bank of Cuba sued the defendant bank for excess collateral which it had pledged with the defendant, and the defendant bank counterclaimed for that excess as an offset against the value of its property in Cuba which was expropriated by Cuba without compensation. A splintered court entered a plurality decision, concluding that the act of state doctrine did not bar the counter-claim. Three justices relied on the so-called "Bernstein exception" to the act of state doctrine, which permits judicial examination of the legal issues raised by the act of a foreign sovereign within its own territory when the representatives of the Executive Branch—charged with the primary responsibility for the conduct of foreign affairs—expressly represent to the court that the application of the act of state doctrine in a particular case would not advance the interests of American foreign policy. *See Bernstein v. N. V. Nederlandsche-Amerikaansche*, 210 F.2d 375 (2d Cir. 1954). Justice Douglas relied on an analogy to the principles of sovereign immunity, to allow a set-off up to the amount of the sovereign's claim. Justice Powell felt that the holding of *Sabbati-*

4. The text of the Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), is as follows:

Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection: *Provided,* That this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law or with respect to a claim of title or other right to property acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court.

*no* had been overly broad, and concluded that *federal courts have an obligation to hear cases such as the one then before the Court, "unless it appears that an exercise of jurisdiction would interfere with delicate foreign relations conducted by the political branches."* The four dissenters felt that *Sabbatino* dictated the opposite result, and that the Bernstein exception was an abdication of the judicial function to the Executive Branch. The Court did not address on the merits the effect of the Hickenlooper Amendment. 406 U.S. at 780, n.5, 92 S.Ct. at 1819–20, n.5 (Brennan, J., dissenting).

Before proceeding to application of the doctrine to the facts in this case, one of the recent opinions on the subject by the Second Circuit should be mentioned. In *Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co., Inc.*, 652 F.2d 231 (2d Cir. 1981), a sugar brokerage company was sued on a debt owed to a Cuban governmental entity. The brokerage company sought to assert a counterclaim as assignee based on the Cuban government's seizure of the assignor's Havana assets. The court found the seizure to be a classic act of state and went on to discuss and reject a number of factors militating against application of the act of state doctrine.

The court first noted that there was no treaty, or other agreement regarding controlling legal principles, which could be used to decide the validity of the taking in that case. Second, it concluded that the Hickenlooper Amendment did not apply because of its interpretation in the Second Circuit as applying only to cases in which the expropriated property has found its way back into the United States, *see Banco Nacional De Cuba v. First National City Bank*, 431 F.2d 394 (2d Cir. 1970), *rev'd on other grounds*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), and because of the fact that the seized assets were still in Cuba. Third, the court observed that the Bernstein exception was not involved because

there had been no expression by the Executive Branch of an opinion that adherence to the act of state doctrine would be against American foreign policy interests. Fourth and finally, the "commercial activity" exception suggested in *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), was considered to be inapplicable because the challenged conduct of the sovereign state was clearly public and governmental in nature, as opposed to private and commercial.

In the cases before this Court, there is no dispute that the action of the PMGSE in nationalizing shares of ESESCO held by Kal-Spice was an act of state. ESESCO was one of one hundred entities subjected to nationalization pursuant to the "Provisional Military Administrative Council Declaration of Economic Policy (based on Ethiopian Socialism)," effective February 3, 1975.

Nor can there be any dispute as to two of the possible exceptions to the doctrine forbidding judicial inquiry into acts of state. It is clear that there has been no statement by the Executive Branch which would invoke the Bernstein exception, even if it were assumed that this exception would be approved by a majority of the Supreme Court. It is also clear that the Declaration was the public governmental act of a foreign sovereign; there has been no suggestion that the PMGSE was engaged in purely commercial activity equivalent to that of private merchants. There are, however, three disputed issues concerning the applicability of the act of state doctrine.

The first issue is posed by the existence of a treaty in this case. In 1953 the United States and Ethiopia ratified a Treaty of Amity and Economic Relations.[5] Article VIII § 2 of the Treaty provides as follows:

> Property of nationals and companies of either High Contracting Party, including interests in property, shall receive the most constant protection and security within the territories of the other High Contracting Party. Such property shall

---

5. The parties have not raised any questions concerning the applicability of this treaty to the PMGSE, and in view of the Court's conclusion

with respect to the treaty, that issue need not be addressed.

not be taken except for a public purpose, nor shall it be taken without prompt payment of just and effective compensation.

The PMGSE contends that this provision is not the type of "treaty or other unambiguous agreement regarding controlling legal principles" contemplated by the Supreme Court in *Sabbatino*. The PMGSE points out that there are no definitions of "prompt," "just," or "effective," and argues that the Treaty does not demonstrate the unambiguous agreement on controlling legal standards which is necessary for judicial decision-making.

This Court agrees. The terms used in § 2 are so inherently general, doubtful, and susceptible of multiple interpretation that in the absence of an established body of law to clarify their meaning a court cannot reasonably be asked to apply them to a particular set of facts.

The uncertain meaning of these terms could be clarified somewhat by resort to the definitions found in the Restatement (Second) of Foreign Relations Law of the United States §§ 187–190 (1965). However, reliance on that authority as accurately expressing the meaning intended by the government of Ethiopia in its Treaty agreement, despite the absence of any reference thereto, would be unwarranted. As the *Sabbatino* court reasoned:

> It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice.

376 U.S. at 428, 84 S.Ct. at 940. The obvious corollary is that where there is little consensus, it is less appropriate for the judiciary to render decisions in an area of international law. The Court went on to observe:

> There are few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens.

> . . . . .

> The disagreement as to relevant international law standards reflects an even more basic divergence ... between the social ideologies of those countries that favor state control of a considerable portion of the means of production and those that adhere to a free enterprise system. [footnote omitted]

*Id.* at 428–29, 84 S.Ct. at 940–941. Since the terms of the Treaty do little to depart from this lack of consensus and establish unambiguous agreement on controlling principles of law, the Court finds that the Treaty cannot be the basis for an exception to the act of state doctrine.

 This conclusion is buttressed by consideration of the purpose of any such exception to the act of state doctrine. The major underpinning of the doctrine is the policy of foreclosing judicial examination of acts of foreign states where such adjudication might involve the possibility of conflict with or embarrassment of the Executive Branch in its conduct of foreign relations. *Dunhill*, 425 U.S. at 697, 96 S.Ct. at 1862; *Sabbatino*, 376 U.S. at 431–33, 84 S.Ct. at 941–942. An exception for "a treaty or other unambiguous agreement regarding controlling legal principles" seems to address a formal and binding statement of agreement upon principles which removes the danger of judicial misconstruction of the foreign policy of the Executive Branch. An example of the type of treaty the *Sabbatino* Court might have had in mind is the Warsaw Convention, which sets forth the circumstances giving rise to liability in international air transportation, the limits of such liability, defenses to liability, types of recoverable damages, time limits for filing complaints, a method of handling procedural questions, and so forth. See note following 49 U.S.C. § 1502. In contrast, the Treaty of Amity and Economic Relations simply does not provide enough in the way of controlling legal standards to remove the danger of conflict with the Executive

Branch that underlies the act of state doctrine.

■ The second issue concerning the applicability of the act of state doctrine to the matter before the Court is the effect of the Hickenlooper Amendment. As noted above, the Second Circuit is of the opinion that the Amendment was intended to prevent the United States from becoming a thieves' market for expropriated property. *First National City Bank.* Accordingly, it was held that the Hickenlooper Amendment did not give to a party such as the First National City Bank the right to apply assets under its control to recoup losses it had suffered by expropriation of its properties in a foreign territory:

> If one fact is clear from the legislative history, it is that this language was designed to be invoked by American firms in order to afford them "a day in court" —and presumably a monetary recovery— when some other entity attempted to market the American firms' expropriated property and some aspect of such an attempted transaction took place in this country. We cannot believe that through the same language Congress intended to create a self-help seizure remedy for those few American firms fortunate enough to hold or have access to some assets of a foreign state at the time that state nationalizes American property. [footnote omitted]

*First National City Bank,* 431 F.2d at 402. *See also Lamborn,* 652 F.2d 231.

This Court finds that analysis persuasive and expressly agrees with the Second Circuit's interpretation. Under that interpretation, there has been no attempt by some other entity to market in the United States the expropriated interest in ESESCO, and the Hickenlooper Amendment therefore does not apply.[6]

6. The Court notes that the United States Senate is presently considering S. 1434, a bill which would eliminate the bar of the act of state doctrine in certain cases. The bill would repeal the Hickenlooper Amendment, and would provide as follows: "No court in the United States shall decline on the ground of the

■ The third and final issue concerning the applicability of the act of state doctrine to these cases is whether this was "a taking of property within its own territory" by the PMGSE. Where the site of the property taken is outside the territory of the foreign state, the act of state doctrine does not apply, and the foreign confiscation will be given effect only if it is consistent with the policy and law of the United States. *United ed Bank Limited v. Cosmic International, Inc.,* 542 F.2d 868 (2d Cir. 1976), *Maltina Corporation v. Cawy Bottling Company,* 462 F.2d 1021 (5th Cir. 1972); *cert. denied,* 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972); *see also* Restatement (Second) of Foreign Relations Law of the United States § 43 (1965). Kal-Spice argues that the nationalized shares of ESESCO stock were located at all pertinent times in Michigan. The PMGSE contends it is well-settled that the legal situs of shares in a corporation is deemed to be the place where the company is incorporated, regardless of the residence of a shareholder or the whereabouts of the stock certificates.

The situs of corporate shares varies depending on the circumstances and purposes for which situs is sought to be determined. 11 W. Fletcher, Cyclopedia of the Law of Private Corporations § 1501 (rev.perm.ed. 1971). For tax purposes, the situs of shares of stock is ordinarily the domicile of the owner of the stock. 14A *id.* § 7003. For attachment and levy under the Uniform Commercial Code, the requirement that the security be seized has the effect of making the situs of the share depend on the situs of the certificate. 11 *id.* § 5106. However, the general rule has been stated as follows:

> It is the settled general rule that the situs of corporate stock is deemed to be in the state where the corporation has its domicile, which is ordinarily the state under whose laws the corporation was creat-

Federal act of state doctrine to make a determination on the merits in any case in which the act of state is contrary to international law." While such a bill, if passed into law, might require a different result, it is elementary that until such time it cannot have any effect on this Court's consideration of the cases before it.

ed, and any question relating to it may be determined there, even though the certificates are without the state and are owned by nonresidents, regardless of the location of the corporation's property and assets. [footnotes omitted]

*Id.* § 5101. As the Supreme Court explained in a venerable case which held that shares of stock were located in the state of incorporation for the purposes of a suit brought in that state to determine whether shares were rightfully held by non-resident stockholders,

> The certificates are only evidence of the ownership of the shares, and the interest represented by the shares is held by the company for the benefit of the true owner. As the habitation or domicil of the company is and must be in the state that created it, the property represented by its certificates of stock may be deemed to be held by the company within the state whose creature it is, whenever it is sought by suit to determine who is its real owner.

*Jellenik v. Huron Copper Mining Co.*, 177 U.S. 1, 13, 20 S.Ct. 559, 563, 44 L.Ed. 647 (1900). *See Kitzer v. Phalen Park State Bank of St. Paul*, 379 F.2d 650 (8th Cir. 1967); *Peckham v. Ronrico Corp.*, 211 F.2d 727 (1st Cir. 1954).

▉ The matter before the Court clearly presents issues arising out of a question of ownership of shares of stock. Kal-Spice has made only a bald assertion that the stock certificates are located in Michigan. It has presented no authority or reason to depart from the general rule that the situs of shares of stock is the place of incorporation. In accordance with that rule, the Court finds that the ESESCO shares had their situs in Ethiopia at the time of the taking,

especially since it appears that all the physical assets of ESESCO for which the stock certificates are evidence of an ownership interest are also located in the place of incorporation, Ethiopia.[7] The confiscation of ESESCO shares was thus "a taking of property within its own territory" by the PMGSE which is encompassed by the act of state doctrine.

This result is consistent with other cases which have addressed the situs of intangible property for purposes of determining the applicability of the act of state doctrine to foreign expropriations. The courts have looked at whether the acts of the foreign government were "able to come to complete fruition within the dominion of the ... government," *Tabacalera Severiano Jorge, S. A. v. Standard Cigar Co.*, 392 F.2d 706, 716 (5th Cir. 1968), *cert. denied*, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968), and at whether a *fait accompli* has occurred which would effectively prevent an American court from reviewing the act's validity, *United Bank*, 542 F.2d at 874. *See* Restatement (Second) of Foreign Relations Law of the United States § 43(1) (1965) (considers whether the act has been "fully executed in accordance with applicable law.") In *Maltina Corporation*, 462 F.2d 1021, for example, the court refused to apply the act of state doctrine to a United States trademark formerly owned by a Cuban corporation which had been expropriated, treating the trademark as property located in the United States. *See Republic of Iraq v. First National City Bank*, 353 F.2d 47 (2d Cir. 1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966) (doctrine not applied to King Faisal's New York bank accounts because only a United States court could compel bank to pay).

7. The PMGSE suggests the appropriateness of an Ethiopian situs for the shares by its reference to Article 341 of the Ethiopian Commercial Code (Rights Arising Out of Shares), which states that "ownership of registered shares shall be established by the relevant entry in the register kept at the head office," and further states that "no transfer is complete until recorded in this register." Thus, a court exercising jurisdiction over the certificates could not effectively transfer shares without the coopera-

tion of the corporation's "head office," which in this case is now controlled by the PMGSE. As the drafters of the Restatement (Second) of Conflict of Laws note in comment c to § 64, "The state where the certificate is located will not exercise judicial jurisdiction over the share except to the extent that such exercise of jurisdiction would be recognized as effective in the state of incorporation." It seems clear that such exercise of jurisdiction would not be recognized as effective in the PMGSE.

In the matter before the Court, the taking of ESESCO shares is a *fait accompli* and there is nothing a United States court can do about it. Control of ESESCO's assets has been achieved by the PMGSE, and any stock certificates in this country which the PMGSE declines to recognize as valid are simply worthless. If this Court ruled otherwise, and refused to apply the act of state doctrine because the share certificates were located in the United States, it would have no power to order that ESESCO recognize the rightful owner of the shares.[8]

■ Accordingly, the Court finds that there are no exceptions applicable here, and holds that the act of state doctrine bars this Court from consideration of the validity of the taking of ESESCO shares from Kal-Spice by the PMGSE. Therefore, the motion to dismiss Case Two is granted. This disposition makes it unnecessary for the Court to consider the motion to strike an affidavit in Case Two and the motion to consolidate the two cases, as well as the other arguments in support of the motion to dismiss.

Finally, there is the motion to join or name the PMGSE in Case One. The Court is of the opinion that its reasoning with respect to the motion to dismiss Case Two is equally applicable here. The acts complained of in the counterclaims all flow from and are a consequence of the expropriation, which was an act of state by the PMGSE. The act of state doctrine thus forbids judicial examination of the validity of the PMGSE's role in the acts complained of, and the motion to join or name must be denied.

In conclusion, the motion for partial summary judgment in Case One is granted because there is no genuine issue as to any fact material to Kal-Spice's liability for goods sold and delivered; the motion to dismiss Case Two is granted on the basis of the act of state doctrine; the motion to join or name is denied for the same reason; and the motions to consolidate and strike are denied because moot.

IT IS SO ORDERED.

8. *See* n.7, *supra.*

## ORDER

In accordance with the attached Opinion dated July 6, 1982, IT IS HEREBY ORDERED pursuant to Fed.R.Civ.P. 56(d) that ESESCO's motion for partial summary judgment against Kal-Spice in K79–400 be granted and that the following facts appear without substantial controversy:

1. That a contract for the purchase and sale of oleoresin was entered into between ESESCO and Kal-Spice.

2. That Order No. 12764, dated October 18, 1974, sets forth the terms of that contract.

3. That pursuant to that Order, ESESCO sold and delivered the oleoresin to Kal-Spice.

4. That the principal amount due ESESCO for the oleoresin is $1,961,980.48.

5. That ESESCO is also entitled to interest computed in accordance with the terms of that Order, less $114,-390.26 already paid by Kal-Spice to ESESCO.

IT IS FURTHER ORDERED that Kal-Spice's motion to join or name the PMGSE in K79–400 be denied; that the PMGSE's motion to dismiss K81–17 be granted; and that Kal-Spice's motion to strike in K81–17, and its motion to consolidate K79–400 and K81–17, both be denied.

IT IS FURTHER ORDERED that Case No. K81–17 be dismissed.

IT IS SO ORDERED.