**EMPRESA CUBANA EXPORTADORA DE AZUCAR y SUS DERIVADOS, Plaintiff-Appellee,**

v.

**LAMBORN & COMPANY, INC., Defendant-Appellant.**

**LAMBORN & COMPANY, INC., Defendant and Third-Party Plaintiff-Appellant,**

v.

**REPUBLIC OF CUBA, Third-Party Defendant-Appellee.**

No. 764, Docket 80–7884.

United States Court of Appeals, Second Circuit.

Argued March 10, 1981.

Decided June 11, 1981.

Andrew M. Calamari, New York City (Law Firm of Richard deY. Manning, New York City, of counsel), for defendant-appellant.

Michael Krinsky, New York City (Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P. C., New York City, of counsel), for plaintiff-appellee and third-party defendant-appellee.

Before KAUFMAN and MANSFIELD, Circuit Judges, and WARD, District Judge.*

MANSFIELD, Circuit Judge:

Defendant Lamborn & Co. (Lamborn), a Delaware corporation engaged in the sugar brokerage business at the time this action was brought, appeals from an order entered by Judge Charles L. Brieant, Jr., of the

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

Southern District of New York[1] allowing the original plaintiff in this case, the Republic of Cuba, to amend its complaint so as to substitute Empresa Cubana Exportadora de Azucar y Sus Derivados (Cubazucar) as plaintiff, and from a judgment pursuant to a second memorandum and order[2] awarding Cubazucar $32,088 plus interest and dismissing Lamborn's counterclaim against Cubazucar as well as its third-party claim against the original plaintiff, the Republic of Cuba. The judgment awarding $32,088 to plaintiff Cubazucar turned principally on Judge Brieant's decision that Lamborn should not be permitted to advance the assigned claim of its principal, Lamborn, Craig & Co. (Craig), against Cubazucar or the Republic of Cuba, for the seizure of Craig's assets in Havana. Lamborn's third-party claim against the Republic of Cuba was denied on the basis of the act of state doctrine.

We affirm, but on somewhat different grounds than those adopted by the district court. We conclude that Lamborn was not precluded because of the assignment from asserting against Cubazucar the claim assigned to it by Craig and that the Cuban seizure of Craig's Havana assets did not constitute payment of Lamborn's debt to Cubazucar. However, Lamborn's attempt to assert the seizure as a counterclaim or third-party claim is barred by the act of state doctrine.

1. *Republic of China v. Lamborn & Co.*, No. 61 Civ. 1847–CLB (S.D.N.Y. Nov. 1, 1979).

2. *Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co.*, No. 61 Civ. 1847–CLB (S.D.N.Y. July 31, 1980).

3. The sale contract indicated that Lamborn was the buyer and Craig the broker, but the documentation surrounding the subsequent disposal of the sugar makes it clear that the reality was precisely the opposite: Craig was the principal and Lamborn the broker. Banco Cubano no longer exists; Cubazucar is its successor in interest.

4. Like most other lawsuits filed in the Southern District of New York in the aftermath of the Cuban Revolution, this case was assigned to the late Judge Frederick vP. Bryan, and remained largely inactive until the handful of test cases selected for active litigation and appeal had been decided. *Banco Nacional de Cuba v.*

In 1960, when the events which precipitated this action occurred, Lamborn was engaged in the sugar brokerage business, handling purchases and sales for others but not for its own account. Many of its trades were made on behalf of Craig, a New York partnership with offices in New York and Havana. Although juridically separate entities, Lamborn and Craig were closely related through equity positions which the Craig partners held in Lamborn.

On March 4, 1960, Lamborn, acting on behalf of Craig,[3] agreed to purchase a quantity of sugar from Banco Cubano del Comercio Exterior, an independent juridical entity wholly owned by the Cuban state. The contract called for the buyer to pay 95% of the estimated purchase price upon shipment, with the final 5% to be paid after adjustments had been made to reflect the exact weight and polarization of the sugar received. On May 24, 1960, the sugar arrived in the United States and payment representing 95% of the estimated purchase price was made by Lamborn. A balance of $32,088, representing the final 5% of the purchase price, remained due to the seller and has never been paid. In October, 1960, a Cuban official requested that Craig make arrangements to have Lamborn pay the final 5% of the contract. When no payment was forthcoming, this action to recover on the debt was filed on May 24, 1961.[4]

*Sabbatino*, 193 F.Supp. 375, 84 S.Ct. 923, 11 L.Ed.2d 804 (S.D.N.Y.1961), *aff'd*, 307 F.2d 845 (2d Cir. 1962), *rev'd*, 376 U.S. 398 (1964), *on remand sub nom. Banco Nactional de Cuba v. Farr*, 243 F.Supp. 957 (S.D.N.Y.), 272 F.Supp. 836 (S.D.N.Y.1965), *aff'd*, 383 F.2d 166 (2d Cir. 1967), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968); *Banco Nacional de Cuba v. First National City Bank*, 270 F.Supp. 1004 (S.D.N.Y.1967), *rev'd*, 431 F.2d 394 (2d Cir. 1970), *vacated and remanded*, 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971), *on remand*, 442 F.2d 530 (2d Cir. 1971), *rev'd*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (5–4 decision with three opinions supporting reversal), *on remand*, 478 F.2d 191 (2d Cir. 1973); *F. Palicio y Compania v. Brush*, 256 F.Supp. 481 (S.D.N.Y.1966), *aff'd. per curiam*, 375 F.2d 1011 (2d Cir.), *cert. denied sub nom. Brush v. Republic of Cuba*, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967), *action continued sub nom. Menendez v. Faber, Coe & Gregg,*

In the meantime, on December 30, 1960, the Cuban Minister of Labor issued Resolution No. 25187 designating an "interventor" to take over the management of the Havana offices of Craig for a period of one year. The intervention was undertaken pursuant to Law No. 647 of November 14, 1959, which authorized the Minister of Labor "to provide for the intervention, whenever he deems it necessary, of the work centers or enterprises at which the normal production rate is ostensibly altered." [5] Resolution 25187, in announcing the takeover by intervention of Craig, declared that the decision to intervene had been made in response to a November 15, 1960, petition sent to the Minister of Labor by Craig's Cuban labor representatives, who sought intervention "owing to the problem that arises concerning the displacement of its workers upon the complete discontinuance of the operations of that firm." When the Labor Minister's appointed interventor, Jose Joaquin Garcia Esquerre, took control of Craig's Cuban offices on January 5, 1961, he prepared and signed an inventory of the Craig assets being seized. Included in that inventory was a bank account showing a balance of 91,353 pesos.[6] Despite the fact that Law No. 647 provided for an eventual accounting to the original owners of assets, no such accounting has ever been made. On January 9, 1961, four days after the formal takeover of its Havana offices, Craig assigned to Lamborn any and all claims which it might have against the Cuban government or any of its agencies as a result of the intervention. In return, Lamborn agreed to pay Craig any net proceeds that it might recover in litigation with Cuba.

In the district court, Lamborn's principal argument [7] was that it should be permitted to assert the assigned Craig claim as a payment defense or as a counterclaim to Cubazucar's action on the debt. The district court rejected this argument on two grounds. First, it felt controlled by its own recent resolution of a similar question in *Banco Nacional de Cuba v. Chase Manhattan Bank.*[8] In that case Chase employees

*Inc.*, 345 F.Supp. 527 (S.D.N.Y.1972), *aff'd and modified sub nom. Menendez v. Saks and Co.*, 485 F.2d 1355 (2d Cir. 1973) (Mansfield, J.), *cert. granted sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 422 U.S. 1005, 95 S.Ct. 2624, 45 L.Ed.2d 668 (1975) (inviting briefs on whether *Sabbatino* should be reconsidered), *rev'd*, 425 U.S. 682, 95 S.Ct. 1854, 48 L.Ed.2d 301 (1976). When Judge Bryan died in 1978 without reaching the instant action, it was assigned to Judge Brieant.

5. Law No. 647 provided that interventions were to last for a period of six months, and could be extended once for an additional six months; Law No. 843, which amended Law No. 647, provided that an unlimited number of six-month extensions would be permitted if necessary.

6. At the time of the intervention, the official exchange rate in Havana was one peso to the dollar.

7. Lamborn advanced a number of other arguments below and on appeal, all of which we have considered and find to be without merit. Cubazucar's inability to introduce into evidence the documentation normally generated by a sugar sale was not fatal to its action on the debt, because Lamborn's own invoice to Craig was sufficient to show that the $32,088 which Cubazucar seeks was in fact due and owing.

The allegation that this action is defective because no formal demand for payment was ever made on the buyer also fails, because the normal rules of agency establish that Cubazucar's undisputed demand on Craig was sufficient to put Lamborn on notice. Restatement (Second) of Agency § 9(3) (1958).

Nor did the district court abuse its discretion in allowing the original plaintiff to amend the complaint, substituting Cubazucar as plaintiff, despite the lapse of time involved. Lamborn suffered no discernible prejudice from the amendment.

Finally, Lamborn's argument that prejudgment interest should not be allowed must be rejected on the strength of this court's controlling determination in *Menendez v. Saks and Co., supra, rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Lamborn's argument that the six percent interest rate established by New York CPLR § 5004 in 1972 must be applied retroactively is similarly at odds with the relevant case law. See 5 Weinstein-Korn-Miller, *New York Civil Practice* § 5004.01 (1972 & Supp.1979) (collecting cases).

8. 505 F.Supp. 412 (S.D.N.Y.1980), *appeal* 658 F.2d 875 (2d Cir. 1981). The *Chase* action, along with five parallel actions argued at the same time, *Banco Nacional de Cuba v. Chemical*

who had been forced to flee Cuba were compensated by Chase for the value of any property which they had left behind (all of which had been confiscated by the Cuban government). The compensated employees assigned to Chase any claims they might have against Cuba arising out of the confiscation, and Chase attempted to assert these assigned claims as a set-off against its liability to plaintiff Banco Nacional as a result of Chase's failure to return to Banco Nacional a $7,256,000 surplus which had remained after Chase liquidated Banco Nacional's loan collateral in the aftermath of the Cuban Revolution. The district court refused to allow the set-off, reasoning that:

"The entitlement to set-off found in [*Banco Nacional de Cuba v. First National City Bank*, 270 F.Supp. 1004 (S.D.N.Y. 1967), *rev'd*, 431 F.2d 394 (2d Cir. 1970), *vacated*, 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971), *on remand*, 442 F.2d 530 (2d Cir. 1971), *rev'd*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), *on remand*, 478 F.2d 191 (2d Cir. 1973)] should not be regarded to embrace counterclaims or set-offs originally belonging to a third party and acquired by a defendant in anticipation of litigation, or after it has been sued by a foreign state, and in order to set-off. To hold otherwise would call up a brisk trade in claims against foreign states, and would in effect nullify the Act of State doctrine, and prevent access by the Government of Cuba to the United States courts against any United States defendant having the willingness and creativity to buy up Cuban claims of others to assert as assignee. This case is not one where Chase went out shopping for claims to assert against plaintiff, but we cannot allow a result here which would permit that to be done in the next case. Here, the assignors of the claims had a special relationship to Chase, and indeed Chase had a moral obligation, and perhaps a legal one [*Cohn v. Lionel Corp.*, 21

N.Y.2d 559, 563, 289 N.Y.S.2d 404, 408, 236 N.E.2d 634, 636–37 (1968)], to reimburse them for their losses, and did so. However, the Court concludes that this is not a proper item for recovery by way of set-off. The set-off extends to Chase's property expropriated by Cuba, and not the property of others expropriated, even when such assignments were given to Chase for a proper purpose and for full value paid. This item is disallowed." *Banco Nacional de Cuba v. Chase Manhattan Bank*, 505 F.Supp. at 459.

The district court also decided in the present case that dismissal of Lamborn's defense based on the assignment to it of Craig's claim was called for by New York Judiciary Law §§ 489 and 495, which prohibit corporations from taking the assignment of claims with intent to bring suit thereon. Turning to Lamborn's third-party claim against the Republic of Cuba, the district court found that it was barred by the act of state doctrine.

## DISCUSSION

■ At the outset we do not share the district court's view that Lamborn was barred from advancing on its own behalf any claim Craig had against the Cuban government as a result of the Havana intervention. The district court's holding in *Chase* is clearly distinguishable. The assigned claims in *Chase* were personal claims originally belonging to Chase employees who had fled Cuba, and were totally unrelated to the transaction which had given rise to Banco Nacional's direct claim. Here, by contrast, Craig was not a stranger to the commercial transaction giving rise to Cubazucar's claim, but was instead intimately involved in it, both as putative broker and actual buyer. Moreover, Lamborn and Craig were at all times closely affiliated in the same sugar business as well as being linked by a formal principal-agent relation-

*Bank New York Trust Co.*, 658 F.2d 903, *First Bank of Boston (International) v. Banco Nacional de Cuba*, 658 F.2d 895, *Banco Nacional de Cuba v. Irving Trust Co.*, 658 F.2d 903, *Banco Nacional de Cuba v. Manufacturers Trust Co.*,

658 F.2d 903, and *Banco Para el Comercio Exterior de Cuba v. First National City Bank*, 658 F.2d 913, are currently pending before another panel of this court.

ship in the transaction under consideration. In fact, since Lamborn was acting as Craig's agent here, plaintiff itself had the clear option of suing Craig directly. Restatement (Second) of Agency § 186 (1958). Under these circumstances, the district court's decision in *Chase* is not controlling, and the fears there expressed that a different result would "call up a brisk trade in claims against foreign states" are not relevant.

Nor does this case involve a champertous assignment of the kind outlawed by § 489 of the New York Judiciary Law. The purpose of § 489 (and its predecessor, § 275 of the Penal Law)

> "is to aid in the enforcement of 'time honored public policies' against champertous agreements and real or implied practice of law by corporations." *American Hemisphere Marine Agencies, Inc. v. Kreis*, 244 N.Y.S.2d 602, 603, 40 Misc.2d 1090, 1091 (Sup.Ct.N.Y.Cty.1963).

New York courts have been careful to limit the application of § 489 to situations where the danger at which it was aimed could conceivably arise. Where the relations between the assignor and the assignee are such as to eliminate that danger, New York courts have refused to apply the statute. For example, in *American Hemisphere*, a motion to dismiss based on the statute was denied because the plaintiff-assignee and the assignor had both been involved in the subject transaction:

> "it is uncontradicted that plaintiff and its assignor are interrelated corporations, and it is clear that plaintiff itself was involved in the transactions alleged from the very beginning. In such circumstance, the assignment was not in the purview of Section 275 of the Penal Law

[predecessor of current section 489], and defendants' contentions thereon are rejected." *Id.* 244 N.Y.S.2d at 603.

See also *Prudential Oil Corp. v. Phillips Petroleum Co.*, 69 A.D.2d 763, 415 N.Y.S.2d 217 (1st Dep't 1979); *Williams Paving Co. v. United States Fidelity & Guaranty Co.*, 67 A.D.2d 827, 413 N.Y.S.2d 73 (4th Dep't 1979). In this case, as in *American Hemisphere*, the assignment was made between two closely affiliated business enterprises, both of which had been parties to the transaction upon which suit was brought. As a result, we are convinced that New York courts would not apply § 489 to this case, and therefore we decline to do so.

■ Turning to the merits, we first address Lamborn's claim that Cubazucar's action on the debt must be dismissed because payment has already been made. According to Lamborn, Cuba's seizure of the Craig Havana peso bank account amounted to payment of Lamborn's obligation under the sugar contract. We disagree. It is primer hornbook that payment cannot occur unless the debtor makes it and the creditor receives it with the intent of thereby extinguishing the debt. 70 C.J.S. *Payment* § 1; 60 Am.Jur.2d *Payment* § 1. As counsel for Lamborn conceded at oral argument, the Republic of Cuba, in seizing Craig's offices in Havana, did not intend thereby to obtain payment of the $32,088 owed its bank by Lamborn. As far as this record reveals, the Cuban government's decision to intervene in Craig's operations was completely unrelated to the Lamborn-Banco Cubano sugar contract. Since the burden of showing payment is initially on the party raising the defense, 70 C.J.S. *Payment* § 93, in this case Lamborn, its obvious lack of proof of intent is fatal.[9]

---

9. Cubazucar argues on this appeal that Lamborn's payment defense is faulty because the sugar contract being sued on called for payment in dollars whereas the bank account seized was in pesos. Since the central requirement of the payment defense is intent, the dollar/peso distinction is largely irrelevant. If the seized accounts had in fact been dollar accounts, the payment defense would still have failed as long as there was no showing that the seizure had been made with the intent of liqui-

dating the underlying dollar debt. Conversely, Cuban seizure of a peso-denominated account could have constituted payment if it had been shown that Cubazucar had agreed to accept the peso account in liquidation of the dollar obligation. The dollar/peso issue is relevant only to the extent that it provides further confirmation of our basic conclusion that the Cuban government, dependent as it was on sugar sales as its main source of hard currency, would not have casually surrendered a dollar-denominated claim just to seize Craig's Havana assets.

Lamborn also maintained below that it was entitled as assignee to raise the Cuban government's seizure of Craig's Havana assets as a counterclaim or set-off against Lamborn's original debt. Since the value of the assets seized by the Cuban government from Craig was apparently greater than Lamborn's debt to Cubazucar, Lamborn argues that it should not be required to pay plaintiff anything. Cubazucar's response is two-fold. First, it argues that, because Lamborn's counterclaim runs against the Republic of Cuba, it cannot properly be advanced against Cubazucar, which claims to be a juridically separate entity that cannot be considered Cuba's alter ego for the purposes of this action. Second, it maintains that, even if a finding were made that Craig's counterclaim against the Republic of Cuba could validly be asserted against Cubazucar, it would nevertheless be barred by the act of state doctrine.

We need not decide whether Cubazucar and the Republic of Cuba are alter egos since we believe that recovery on the counterclaim is in any event precluded by the act of state doctrine. The seizure of Craig's Havana offices and accounts was a classic act of state. It was carried out pursuant to a formal resolution issued by the Minister of Labor, who was acting on behalf of the undisputedly sovereign Cuban government. The intervenor who took possession of the offices in the Ministry's name was an employee of the Cuban government, and acted on its behalf. In authorizing the intervention, the Minister of Labor was acting within the authority conferred on him by authoritative Cuban law.

As the district court recognized, it is clear that a direct claim by Lamborn or Craig (as distinguished from a counterclaim or set-off) based on this seizure would be barred by the act of state doctrine. The Supreme Court's enunciation of the doctrine in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964), which also involved a counterclaim, leaves no room for doubt:

"the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law."

No factors militating against the applicability of the act of state doctrine are relevant here. There is no treaty or other agreement between the United States and Cuba defining the circumstances under which intervention without compensation is permitted. The Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), passed by Congress in response to *Sabbatino*, which bars invocation of the act of state doctrine where the confiscation was carried out in violation of principles of international law, has been interpreted in this Circuit as applying only to cases in which the expropriated property has found its way back into the United States. *Banco Nacional de Cuba v. First National City Bank*, 431 F.2d 394 (2d Cir. 1970), *rev'd on other grounds*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972). Since in this case the seized assets are still in Cuba, the Hickenlooper Amendment does not apply and we therefore need not decide whether the intervention violated international law except to note the clear absence of evidence of any retaliatory intent on the part of the Cuban government.

Similarly, we need not concern ourselves with those cases where the applicability of the act of state doctrine has been influenced by our Executive Branch's representation of its view that adherence to the doctrine would not advance American foreign policy interests. See, e. g., *First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972). The Executive Branch has expressed no opinion regarding its appropriateness in the instant case. We therefore have no reason to believe that application of the act of state doctrine here

would be inconsistent with the State Department's policy toward Cuba.

Finally, Lamborn cannot rely on *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), to avoid application of the act of state doctrine. While we read the two principal opinions in *Dunhill* to agree that courts should at least be inclined against applying the doctrine when they determine the challenged governmental conduct to be commercial, there is no indication here that the seizure of Craig's Havana assets was anything but the governmental action of a sovereign which it purported to be. In contrast to the clearly commercial dealings of Cubazucar as Cuba's sugar merchant to the world, the Republic of Cuba's seizure of Craig's assets was not a mercantile transaction but rather one designed to respond to labor difficulties of general concern.

Our analysis is unaffected by the fact that the claim being barred here by the act of state doctrine is being asserted both as a counterclaim and as a direct claim. The *Sabbatino* Court has already faced and rejected the argument that a sovereign plaintiff which voluntarily brings an action in American courts should, because it thereby waives its right to avoid a counterclaim on grounds of sovereign immunity, *National City Bank v. Republic of China*, 348 U.S. 356, 75 S.Ct. 423, 99 L.Ed. 389 (1955), also be stripped of its right to invoke the act of state doctrine as a defense to a counterclaim. As the Court analyzed the issues:

"[sovereign] immunity relates to the prerogative right not to have sovereign property subject to suit; fairness has been thought to require that when the sover-

eign seeks recovery, it be subject to legitimate counterclaims against it. The act of state doctrine, however, although it shares with the immunity doctrine a respect for sovereign states, concerns the limits for determining the validity of an otherwise applicable rule of law. It is plain that if a recognized government sued on a contract with a United States citizen, concededly legitimate by the locus of its making, performance, and most significant contacts, the forum would not apply its own substantive law of contracts. Since the act of state doctrine reflects the desirability of presuming the relevant transaction valid, the same result follows: the forum may not apply its local law regarding foreign expropriations.

"Since the act of state doctrine proscribes a challenge to the validity of the Cuban expropriation decree in this case, any counterclaim based on asserted invalidity must fail." 376 U.S. at 438–39, 84 S.Ct. at 945–46.

*Sabbatino* disposes of any objection to our application of the act of state doctrine to counterclaims based on the sovereign immunity analogy.[10] In our view, the Supreme Court's position reflects a clear differentiation between the concept of and reason for sovereign immunity, on the one hand, and the act of state doctrine, on the other. Each deals with a different matter. Sovereign immunity implicates a court's *jurisdictional* power over foreign governments. It is appropriate to deny such immunity against counterclaims to a nation which voluntarily brings suit in American courts and to exercise jurisdiction.[11] By initiating the

---

10. Justice Douglas did on one occasion take the view that the counterclaim exception to sovereign immunity enunciated in *Republic of China* should be recognized in the act of state area as well. *First National City Bank v. Banco Nacional de Cuba, supra*, 406 U.S. 770, 92 S.Ct. 1814. When that argument was made, however, it won no complete converts on the Court, cf. *id.* at 793–96, 92 S.Ct. at 1825–27 (Brennan, J., dissenting); since then, its support in the case law has been very limited. See generally Note, *Rehabilitation and Exoneration of the Act*

*of State Doctrine*, 12 N.Y.U.J. Int'l L. & Pol. 599, 620 & n.137 (1980) (collecting cases).

11. The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611, has recently codified this concept by barring sovereign immunity as a defense to counterclaims up to the amount of the direct claim. See § 1607. Nevertheless, Congress made it quite clear in passing the Act that its views with respect to sovereign immunity were not meant to disturb the act of state doctrine. As the House Report accompanying the Act stated: "[t]he committee has found it unnecessary to address the act of state doctrine

action, the plaintiff sovereign is properly viewed as having waived the immunity which it would otherwise have possessed. The only consequence is to permit adjudication of the merits of the counterclaim according to our own legal principles.

On the other hand, the act of state doctrine mandates the rule to be applied as a matter of our own substantive law, *Alfred Dunhill of London, Inc. v. Republic of Cuba, supra*, at 705 n.18, 96 S.Ct. at 1866 n.18; *Banco Nacional de Cuba v. Sabbatino, supra*, at 438–39, 84 S.Ct. at 945–46, which a plaintiff sovereign may invoke just as it may avail itself of any other rule of the forum when it brings an action in our courts. Depriving a sovereign plaintiff of its act of state defense to counterclaims would be just as arbitrary and unfair as stripping it of its right to invoke any other affirmative defense, such as the statute of limitations or res judicata.

In certain cases, of which this may well be an example, the result of applying the act of state doctrine may be inequitable in that it permits a foreign state to collect on its direct claim while avoiding counterclaim liability for its uncompensated seizure within its own jurisdiction of its debtor's property. Nevertheless, otherwise applicable policy considerations require that the act of state doctrine not be abandoned merely because the sovereign appears as plaintiff. Any other result would inevitably force us to examine the validity of each property seizure made abroad by a foreign sovereign, which is something the Supreme Court has forbidden us to do.

The judgment of the district court is affirmed.

in this legislation since decisions such as that in the *Dunhill* case demonstrate that our courts already have considerable guidance enabling them to reject improper assertions of the act of state doctrine." H.R.Rep.No.94–1487, 94th Cong.2d Sess. 20 n.1, *reprinted in* [1976] U.S. Code Cong. & Ad. News 6604, 6619 n.1. Since at the time the committee was writing the Su-

preme Court in *Sabbatino* had already expressly declined to create a counterclaim exception to the act of state doctrine, there is no reason to think that Congress disapproved of the current jurisprudence allowing sovereign plaintiffs to advance the act of state doctrine as an affirmative defense to counterclaims.