**BANCO NACIONAL DE CUBA,**
**Plaintiff-Appellant,**

v.

**CHEMICAL BANK NEW YORK TRUST COMPANY, Manufacturers Trust Company and Irving Trust Company, Defendants-Appellees.**

Nos. 543–545, Dockets 86–7377, 86–7379 and 86–7387.

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1986.
Final Briefs Submitted March 30, 1987.
Decided June 10, 1987.

Michael Krinsky, New York City (Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, on the brief), for plaintiff-appellant.

John J. Kerr, Jr., New York City (Henry Landau, Deborah M. Reyher, Blake A. Bell, Simpson Thacher & Bartlett, William W. Karatz, David G. Keyko, Winthrop, Stimson, Putnam & Roberts, Robert F. Mullen, Anthony B. Ullman, Cravath, Swaine & Moore, Richard B. Lind, New York City, on the brief), for defendants-appellees.

Before MESKILL, KEARSE, and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

In these consolidated appeals, plaintiff Banco Nacional de Cuba ("Banco Nacional") seeks review of three final judgments of the United States District Court for the Southern District of New York, Charles L. Brieant, Jr., *Judge,* now *Chief Judge,* entered following our remand in *Banco Nacional de Cuba v. Chemical Bank New York Trust Co.,* 658 F.2d 903 (2d Cir.1981) (*"Chemical I"*). Banco Nacional challenges so much of the judgments as upheld the counterclaims of defendants Chemical Bank New York Trust Company ("Chemical"), Manufacturers Trust Company ("Manufacturers"), and Irving Trust Company ("Irving"), to the extent of certain claims asserted by Banco Nacional and hence ordered that Banco Nacional receive nothing on those claims. The district court ruled that defendants' defensive assertion of the counterclaims was not barred by the act of state doctrine and that the counterclaims were meritorious on any of a number of legal theories. Banco Nacional challenges all aspects of these rulings. For the reasons below, we affirm the judgments of the district court.

## I. BACKGROUND

The present cases arose out of the 1960 expropriation by the Republic of Cuba ("Cuba") of the Cuban Electric Company ("Cuban Electric") as part of the January 1959 Cuban Revolution, the background of which has been discussed extensively in our cases, including *Chemical I, Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875 (2d Cir.1981) (*"Chase Manhattan"*), and *Banco Para el Comercio Exterior de Cuba v. First National City Bank,* 658 F.2d 913 (2d Cir.1981) (*"Bancec I"*), *rev'd and remanded,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*"Bancec II"*), *on remand,* 744 F.2d 237 (2d Cir.1984). We assume familiarity with those discussions.

## A. *The Events Involving Cuban Electric*

Cuban Electric was a United States corporation organized under Florida law and controlled by United States nationals. It operated an electric utility in Cuba and had its offices, principal place of business, and substantially all of its assets in Cuba. In 1958 and 1959, each of the defendants participated in a series of loans to Cuban Electric on which the balances plus interest were due to be paid on November 23, 1959. The principal balances due each defendant on that date were:

| | | |
|---|---|---|
| Chemical | — | $ 750,000 |
| Manufacturers | — | $1,100,000 |
| Irving | — | $ 750,000 |

During early 1959, Cuba promulgated laws reducing the rates Cuban Electric could charge and limiting foreign exchange. The combined effect of these laws was to render Cuban Electric unable to repay its loans to defendants when due. Nonetheless, Cuban Electric retained highly valuable noncash assets such as plant and equipment, and as of December 31, 1959, it reported a net worth of $72,613,220.

On July 6, 1960, Cuba passed Law No. 851, which authorized "the nationalization by means of compulsory expropriation, of the property or entities belonging to natural or juridical persons who are nationals of the United States of America or entities in which they have an interest or participation." On August 6, 1960, pursuant to Law No. 851, Cuba issued Executive Power Resolution No. 1 ("Resolution No. 1") which expropriated, *inter alia*, Cuban Electric. Resolution No. 1 provided in part as follows:

### WE RESOLVE:

*First:* There is hereby ordered the nationalization through compulsory expropriation and, consequently, the appropriation in favor of the Cuban State, with absolute right of ownership, of all properties and entities in the national territory and the rights and interests attaching to the operation of said properties and entities, belonging to juridical persons who are nationals of the United States of America or who operate entities in which the majority interest is in the hands of Americans, as follows:

1.—Compania Cubana de Electricidad [Cuban Electric].

. . . .

*Second:* Consequently, it is hereby declared that the Cuban State is subrogated in the place and stead of the juridical persons listed in the preceding paragraph with respect to the properties, rights and interests mentioned as well as the assets and liabilities comprising the capital of the entities referred to.

Resolution No. 1 stated that these actions were undertaken because of "the duty of the peoples of Latin America to seek the recovery of their national wealth by taking the same out of the hands of foreign monopolies and interests." Thereafter, none of the debts to defendants or other United States creditors was repaid.

## B. *The Cuban Banks and the Present Lawsuits*

Prior to October 1960, certain private Cuban banks (the "Cuban banks") had deposited moneys in accounts with each of the defendants. The Cuban banks were nationalized by Cuba in October 1960, and Banco Nacional was their successor in interest. At that time, the Cuban Banks had on deposit with defendants the following sums:

| | | |
|---|---|---|
| Chemical | — | $236,756.11 |
| Manufacturers | — | $427,181.19 |
| Irving | — | $ 51,461.89 |

Each defendant looked to these accounts as assets against which the unpaid loans to Cuban Electric could be offset and refused to release the accounts when requested to do so in late 1960.

In 1961, Banco Nacional commenced these actions, seeking, insofar as is pertinent to the present appeals, recovery of the amounts in these accounts as successor in interest to the Cuban banks (the "successor claims"). Each defendant interposed defensive counterclaims to the successor claims, based on the debt owed it by Cuban

Electric, to the extent of Banco Nacional's claims. Each defendant sought only the dismissal of the successor claims; though each Cuban Electric debt far exceeded the total on deposit from the Cuban banks, no defendant sought an affirmative recovery.

## C. *The Decision in* Chemical I

In 1980, the district court dismissed Banco Nacional's successor claims on their merits, holding that Cuba had expropriated the United States assets of the Cuban banks in violation of international law. In *Chemical I,* we rejected this holding and vacated the dismissal of these claims. We proceeded to consider the defendants' counterclaims as an alternative ground for dismissal of Banco Nacional's successor claims.

In light of the then-current state of Supreme Court case law, we held that adjudication of the counterclaims in these cases would be barred by the act of state doctrine unless the Executive Branch furnished a so-called *"Bernstein* letter," *see Bernstein v. N.V. Nederlandsche—Amerikaansche Stoomvaart—Maatschappij,* 210 F.2d 375 (2d Cir.1954) (per curiam), advising the courts that the Executive Branch believed the doctrine need not be applied in these suits. *Chemical I,* 658 F.2d at 911; *see First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) *("Citibank");* *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Chase Manhattan,* 658 F.2d at 884; *Empresa Cubana Exportadora de Azucar y Sus Derivados v. Lamborn & Co.,* 652 F.2d 231, 237–39 (2d Cir.1981). We concluded that we could not, on the then-existing record, accept defendants' contention that a 1970 State Department letter sent in connection with a Cuban expropriation counterclaim asserted in *Citibank* (the *"Citibank* letter"), which stated the Department's view that the act of state doctrine should not bar consideration of counterclaims in that case "or like cases," constituted the requisite *Bernstein* letter here. We inferred that silence on the part of the Executive Branch in connection with a particular case would not preclude justiciabili-

ty if the case were "like" Citibank; but we noted that there were differences between defendants' counterclaims in these actions and those involved in cases found covered by the *Citibank* letter. Thus, we concluded that "[i]n the absence of a clearer record, or at least findings as to the views of the Executive Branch, we cannot determine whether the preconditions to justiciability of the present defendants' counterclaims have been satisfied," and we remanded for further consideration of this question. *Chemical I,* 658 F.2d at 912. We stated that if the district court found on remand that the Executive Branch had made the kind of statement necessary to support justiciability, the court should proceed to rule on the merits of the counterclaims. *Id.* at 912–13.

## D. *The Proceedings on Remand*

Following *Chemical I,* both Banco Nacional and defendants solicited the views of the State Department. The State Department initially responded by furnishing the parties with a copy of a letter that had been filed with the court in *Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia,* 729 F.2d 422 (6th Cir.1984), (the *"Kalamazoo* letter"). The *Kalamazoo* letter provided instruction as to how a court should interpret the Department's failure to state a position in a particular case involving an act of state. Positing that the mere complication of the United States' relations with the expropriating state should rarely lead the court to abstain from adjudicating a dispute, the Department stated that the only reason for nonadjudication when the State Department is silent would be the potential that a compensation standard adopted by the court would conflict with the later assertion by the Executive Branch, in the conduct of foreign relations, of a different standard. Therefore, the State Department stated that even if it did not issue a *Bernstein* letter covering the precise situation in a case, "[w]hen ... there is a controlling legal standard [of international law] for compensation, we believe that the presumption should be that

adjudication would not be inconsistent with foreign policy interests under the Act of State Doctrine." (*Kalamazoo* letter at 2.) The *Kalamazoo* letter concluded as follows:

> As a general rule, ... where there is a controlling legal standard for compensation we would not plan to inform the courts of the absence of foreign policy objections to adjudication of expropriation claims. Therefore, we would anticipate that silence on the part of the Executive in such cases would not be relied upon as a basis for judicial abstention under the Act of State Doctrine.

(*Id.* at 3.) Having alerted the parties herein to the *Kalamazoo* letter, the State Department later wrote that the Executive Branch "do[es] not believe the record is sufficiently developed, nor the issues suitably framed, for the Executive Branch to make any statement at this time" about the cases at bar. (Letter from State Department Legal Adviser Davis R. Robinson to Henry Landau, dated March 7, 1984.)

Thereafter, in a detailed opinion reported at 594 F.Supp. 1553 (1984), the district court found the counterclaims justiciable. First, the court held that in light of certain statements of the Supreme Court in *Bancec II*, 462 U.S. at 630–34 & nn. 25, 28, 103 S.Ct. at 2601–03 & nn. 25, 28, a *Bernstein* letter was not a prerequisite to the justiciability of the defensive counterclaims in these actions. *See* 594 F.Supp. at 1556–57. Second, the court found that even if a *Bernstein* letter were required, the counterclaims were "like cases" within the meaning of the *Citibank* letter, *see id.* at 1562–1565, and that entertaining them was consistent with the *Kalamazoo* letter, *see id.* at 1566.

On the merits, the district court decided that the counterclaims were sustainable on various grounds. In a Memorandum and Order dated April 17, 1986, it ruled that the counterclaims had merit because the Cuban Government had assumed the liabilities of Cuban Electric, and that, as Banco Nacional was pursuing the successor claims as an agent of the Cuban Government, the coun-terclaims were assertable against Banco Nacional. The court stated as follows:

> When the Cuban Government nationalized Cuban Electric and, by resolution appropriated to itself "the rights and interests attaching to the operation of" the corporation and its property, it made clear that it intended to stand in the shoes of Cuban Electric. The resolution included the following paragraph:
>
> > Second: Consequently, it is hereby declared that the Cuban State is subrogated in the place and stead of the judicial [*sic*] persons listed in the preceding paragraph with respect to the properties, rights and interests mentioned as well as the assets and liabilities comprising the capital of the entities referred to.
>
> By the clear language of this resolution the Republic of Cuba subrogated itself to Cuban Electric and inherited or assumed liability for its debts. Defendants are therefore entitled to prevail on their counterclaims against the Cuban Government.

*Id.* at 4–5. In Supplemental Findings of Fact and Conclusions of Law also dated April 17, 1986 ("Findings"), the court reiterated that Cuba was liable because it had assumed Cuban Electric's liabilities to defendants. It also ruled that Cuba was liable under international law for taking the property of defendants, under quasi-contract principles for unjust enrichment from the expropriation of Cuban Electric, and under the " 'internationally recognized equitable principles' " enunciated in *Bancec II*. (Findings at 10–11 (quoting *Bancec II*, 462 U.S. at 633, 103 S.Ct. at 2603).)

Judgments were entered ordering that Banco Nacional take nothing on its successor claims in light of defendants' meritorious counterclaims for greater amounts. These appeals followed.

## II.  JUSTICIABILITY

After oral argument of these appeals, this Court wrote to the State Department to inquire whether the Executive Branch wished to make any further statement as to its views on the act of state issues in

these cases. The Attorney General of the United States responded to this inquiry by filing a Statement of Interest of the United States which stated, quoting an attached letter from the State Department, that "[s]hould the counterclaims ultimately require judging an act of state within Cuba, the Department of State does not perceive foreign relations difficulties that should bar adjudication of these cases on the merits." The State Department letter concluded:

> The defendants in these cases are presenting counterclaim set-offs, a factor which significantly limits adverse foreign relations impacts. In this critical sense, these cases are like other cases to which the Legal Adviser's letter of November 17, 1970 [the *Citibank* letter] applies. We do not consider it significant that the deposits in the New York banks in these cases became the property of the plaintiff after the alleged act of state affecting the banks' loans to Cuban Electric. A potentially more significant difference is the fact that these counterclaims deviate from the scheme underlying the Foreign Claims Settlement Commission program for Cuba, which contemplates protecting unsecured creditors, like shareholders, derivatively, through claim of the expropriated enterprise. 22 U.S.C. 1643d(a). However, insofar as the foreign relations aspect of this issue is concerned, the impact of these counterclaims on possible future claims settlement negotiations with Cuba is remote and speculative and does not compel us to call upon the court to abstain from its normal duty to adjudicate cases properly before it.

(Letter from State Department Legal Adviser Abraham D. Sofaer to the Solicitor General of the United States, dated March 12, 1987, at 2).

■ This letter is an explicit statement by the Executive Branch that, in the view of that Branch, the act of state doctrine need not be applied to the present counterclaims. It fulfills any requirement that a *Bernstein* letter be provided.

■ In *Chemical I* we ruled, at least implicitly, that the other two preconditions to justiciability—*i.e.*, that the counterclaims be asserted only as setoffs without a request for affirmative relief, and that there be no showing that their adjudication would conflict with delicate foreign relations—had been met. *See* 658 F.2d at 911–913. Nothing in the record as it now stands requires any change in that view. Accordingly, we now hold that the act of state doctrine does not bar adjudication of defendants' counterclaims in the present action.

### III. THE MERITS OF THE COUNTERCLAIMS

On appeal, Banco Nacional challenges each of the theories on which the district court upheld the counterclaims. In affirming, we focus only on the theories (1) that Cuba assumed all liabilities of Cuban Electric, thereby becoming obligated to defendants under principles of contract law, and (2) that, if Cuba nationalized Cuban Electric without assuming responsibility for the debts owing to defendants, it took property belonging to defendants and thus was obligated to them under principles of international law. In disputing these theories, Banco Nacional contends, *inter alia*, (1) that Cuba did not assume the liabilities of Cuban Electric with respect to United States creditors, but that if it did, it rescinded any such assumption shortly thereafter, and (2) that what was taken in the expropriation of Cuban Electric did not constitute property belonging to defendants and that international law simply does not require a state to compensate the creditors of a company it has expropriated.

We have considered all of Banco Nacional's arguments with respect to these theories and conclude that whether or not Cuba assumed liability for the payment of Cuban Electric's debts to United States creditors, the counterclaims were properly upheld because Cuba's refusal to pay United States creditors—either by having assumed only debts to non-United States creditors or by having assumed but later repudiated the obligation to pay United States creditors—

was discriminatory, and thus international law makes Cuba liable either for a taking or for a breach of obligation.

### A. Discriminatory Actions Under International Law

As a general principle of international law, a state is liable to a private person who is a national of another state if it takes the foreign national's property and the taking is "discriminatory." A taking pursuant to a program that excludes from compensation all aliens or all aliens of a particular nationality is discriminatory. *See* Restatement (Revised) of the Foreign Relations Law of the United States ("Restatement (Revised)") § 712(1) (Tent.Draft No. 7, 1986); *id.* comment *f.* Similarly, a state's repudiation or breach of its contract with a foreign national is redressable under international law if that repudiation or breach was discriminatory. *Id.* § 712(2).

It is clear beyond peradventure that the actions of the Cuban Government toward United States nationals were intended to be discriminatory. The terms of Law No. 851 singled out "nationals of the United States," stating that Cuba sought to expropriate their property or entities in which they had an interest or participation. Thus, a broad-scale intent to discriminate against United States nationals was explicit. *See generally Banco Nacional de Cuba v. First National City Bank,* 478 F.2d 191, 194 (2d Cir.1973); *Banco Nacional de Cuba v. Farr,* 383 F.2d 166, 183–85 (2d Cir.1967), *cert. denied,* 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1968); *Banco Nacional de Cuba v. Sabbatino,* 307 F.2d 845, 868 (2d Cir.1962), *rev'd on other grounds,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); Restatement (Revised) § 712 Reporters' Note 5.

Insofar as the nationalization of Cuban Electric was concerned, the discrimination against United States nationals was likewise explicit, as Resolution No. 1 stated that Cuba sought ownership of Cuban Electric and other entities "belonging to juridical persons who are nationals of the United States or who operate entities in which the majority interest is in the hands of Ameri-

cans." The declared goal in nationalizing Cuban Electric and the other listed companies was to take Cuban "national wealth" out of the hands of foreign interests.

Consistent with Cuba's declared intent, the actions of Cuba toward United States nationals have in fact been discriminatory. Thus, it is beyond dispute that Cuba has refused to pay anything to United States creditors, while paying or remaining obligated to pay Cuban creditors. Banco Nacional states in its brief to this Court that "[t]here is a uniform pattern of the Republic of Cuba not having paid the debts owing to creditors located abroad of [Cuban Electric]." (Brief for Plaintiff-Appellant at 40.)

In all the circumstances one can only conclude that Cuba's actions were intended to and did discriminate against United States nationals within the meaning of international law. For the reasons below, this conclusion requires that we affirm the decision of the district court whether Cuba assumed, as the district court found, the obligation to pay United States creditors, or did not assume, as Banco Nacional contends, the obligation to pay United States creditors.

### B. The Assumption Assumption

We treat first the proposition that in Resolution No. 1 Cuba assumed all of the liabilities of Cuban Electric and thereby became obligated to pay the debts of that company to foreign and domestic creditors alike. This hypothesis, though implausible in light of the expressed desire of Cuba to seize the wealth of United States entities and reserve it for the Cuban people, has some support, as the district court found, in the language of Resolution No. 1.

Assuming that there was such an assumption, however, it is plain that the obligations thereby assumed were repudiated with respect to United States creditors. The district court found that defendants had never been paid, and it is conceded that since the appropriation none of Cuban Electric's United States creditors have been paid. Indeed, Banco Nacional argues, in an effort to have Cuba avoid contract liability,

that if there was originally an all-inclusive assumption of liabilities, it was swiftly modified to exclude liabilities representing debts owed to United States nationals. Yet even on the hypothesis that Cuba assumed all of Cuban Electric's liabilities, defendants' rights to prevail on these counterclaims do not rest solely on principles of contract law.

As discussed above, international law makes a state liable for a repudiation of its contract with a foreign national if that repudiation was discriminatory, *i.e.*, if it repudiated as to all aliens or as to all aliens of that nationality. There is no indication in the record that the assumption of liability for debts owing to Cuban creditors was ever repudiated. Since it has not paid United States creditors, it is clear that Cuba's partial repudiation of its assumption was discriminatory. Thus, if it assumed all of Cuban Electric's liabilities, Cuba is responsible under international law for the injury caused to defendants by the discriminatory repudiation of the obligation to repay debts to United States creditors.

### C. *The Non-Assumption Assumption; Taking Property of a Creditor*

The alternative hypothesis, *i.e.*, that Cuba did not assume all of Cuban Electric's liabilities, is divisible into two further possibilities: Cuba either assumed some of those liabilities or assumed none of them. We may quickly dismiss the latter possibility, for if Cuba assumed no liabilities whatever, the assumption-of-liabilities language of Resolution No. 1 would be nonsensical. We note that Banco Nacional does not contend that no liabilities were assumed. Rather, it argues that some liabilities were assumed but that these did not include liabilities to United States creditors. This is a plausible hypothesis and is the one we now explore.

The nonassumption theory is that if Cuba did not assume the liabilities representing debts owing to United States creditors, its nationalization of Cuban Electric took property belonging to defendants, thereby causing them compensable injury. In opposition, Banco Nacional argues that when a state nationalizes an enterprise, the only property "taken" is that of the enterprise, not that of the enterprise's creditors; thus, international law imposes no obligations upon that state in favor of those creditors. This statement, accurate as far as it goes, does not take into account the material fact of discrimination.

■ Preliminarily, we note that there can be little question that a creditor's right to repayment is property. As defined in international law, property commonly includes intangible assets and "any interest in property if such interest has a reasonably ascertainable value." Restatement of the Foreign Relations Law of the United States § 191 (1965). This definition plainly encompasses a creditor's right to repayment. *See, e.g., Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 521 & n. 3 (2d Cir.), *cert. dismissed pursuant to Sup.Ct.R. 53*, —— U.S. ——, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985); *In re Claim of Eagle Pencil Co.*, No. SOV–2934 (Foreign Claims Settlement Commission ("FCSC") 1959), *reprinted in* FCSC: Tenth Semi-Annual Report to Congress ("Tenth Report") at 226, 227 (1959); *In re Williams*, No. SOV–4A (FCSC 1957), *reprinted in* FCSC: Tenth Report, at 203 (1959); Draft Convention on the International Responsibility of States for Injuries to Aliens, *reprinted in* Sohn & Baxter, *Responsibility of States for Injuries to the Economic Interests of Aliens*, 55 Am. J.Int'l L. 545, 567, 574 (1961); Wortley, *Observations on the Public and Private International Law Relating to Expropriation*, 5 Am.J.Comp.L. 577, 584–85 & n. 20 (1956). Thus, Cuban Electric's debts to defendants were defendants' "property." The question remains whether this property was "taken."

■ In general, if a state merely expropriated a debtor's assets and treated all of its creditors alike, both foreign and domestic, the state would not be liable under principles of international law to foreign creditors for a taking of their property. This is because, though the expropriation of the assets deprived the debtor of the wherewithal to make repayment, any inju-

ry suffered by the creditors would be regarded as a remote and incidental, rather than a proximate, result of the expropriation. *See Dickson Car Wheel Co. (U.S.A.) v. United Mexican States,* 4 Rep. Int'l Arb. Awards 669, 681 (General Claim Commission 1931); *In re Claim of Skins Trading Corp.,* No. CZ–734 (FCSC 1960), *reprinted in* FCSC: Fourteenth Semi-Annual Report to Congress, at 120, 121 (1961); *In re European Mortgage Series B Corp.,* No. HUNG–1,605 (FCSC 1959), *reprinted in* FCSC: Tenth Report, at 72, 75–76 (1959).

▮ Nonetheless, international law recognizes that when the rights of creditors are "directly affected" by the expropriation of the debtor's assets, the expropriation does constitute a taking of property belonging to the creditors. 8 M. Whiteman, *Digest of International Law* 994 (1967). The requisite directness may occur, for example, when the state that expropriates the debtor's assets also takes action directly against the creditors, as by annulling their claims or barring suit thereon. *See id.* at 994, 997–98; *In re Claim of Eagle Pencil Co.; In re Williams.* The requisite nexus may also exist when the nonpayment of foreign creditors is the product of deliberate national discrimination. *See, e.g., Allied Bank International v. Banco Credito Agricola de Cartago,* 757 F.2d at 519, 521 & n. 3 (decree prohibiting payment of foreign debts, if given effect, would constitute a taking); *cf. Dickson Car Wheel Co. (U.S.A.) v. United Mexican States,* 4 Rep.Int'l Arb.Awards at 681 (suggesting that creditor would have a taking claim if taking of debtor's assets were for purpose of injuring creditor); Restatement of the Foreign Relations Law of the United States § 192 ("Conduct attributable to a state that is *intended* to, and does, effectively deprive an alien of substantially all the benefits of his interest in property, constitutes a taking of the property ... even though the state does not deprive him of his entire legal interest in the property.") (emphasis added).

If, as Banco Nacional argues, Cuba did not assume liabilities representing debts owing to United States creditors, it is the latter set of principles that is implicated, for under this hypothesis, the nationalization of Cuban Electric plainly did not treat all creditors alike. Instead Cuba expropriated all of the company's assets while providing for some of its creditors to be compensated, excluding from compensation any who were United States nationals.

▮ The nationalization of Cuban Electric was thus accompanied by discriminatory action that was intended to and did proximately deprive United States creditors of their Cuban property. Since the actions had their intended effect of taking wealth of United States nationals, it cannot be said that that effect was remote or incidental. The requisite nexus between the expropriation of Cuban Electric and the losses suffered by defendants has adequately been shown, and under the above principles of international law, Cuba may properly be held liable for those losses.

To summarize, if, as discussed in Part III.B. above, Cuba assumed all liabilities of Cuban Electric including those representing debts to United States nationals, it is liable to these defendants because its repudiation with respect to United States nationals was discriminatory. If, as discussed in this Part, Cuba, in nationalizing Cuban Electric, assumed some liabilities but excluded those representing debts to United States nationals, it is liable to these defendants because its actions were intended to and did directly deprive United States nationals of their rights to collect, thereby discriminating against them and effecting a taking that is compensable under international law.

### D. *Banco Nacional's Other Contentions*

Banco Nacional also contends that defendants' counterclaims should be rejected because the setoffs will operate as preferences prejudicing other United States nationals having claims against the Cuban government, and because Cuban Electric was insolvent when nationalized and its nationalization thus caused defendants no injury. We reject both contentions.

**240**

 As to the alleged preferences, this Court has held that victims of Cuban expropriation may assert counterclaims as setoffs even though, in effect, preferences may result. *See Menendez v. Saks & Co.,* 485 F.2d 1355, 1373–74 (2d Cir.1973), *cert. denied on this issue,* 425 U.S. 991, 96 S.Ct. 2201, 48 L.Ed.2d 815 (1976), *rev'd on other issues sub nom. Alfred Dunhill of London Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). Counterclaims not seeking affirmative recovery are usually not disallowed as preferences. *See, e.g.,* 11 U.S.C. § 553 (1982 & Supp. III 1985). This is especially appropriate when the setoffs were asserted well before the legal formation of an estate for the benefit of creditors. Here it was not until 1963 that the United States Government froze Cuban Government assets in this country, thereby creating such an estate. Thus, it cannot be said that defendants will unduly benefit to the prejudice of other claimants since without the assertion of these counterclaims in 1961 the sums on deposit from the Cuban banks would not have been frozen and would doubtless have been removed from the United States by Banco Nacional long before 1963.

As to the alleged lack of injury, neither the record nor the district court's findings support Banco Nacional's contention that Cuban Electric was insolvent when it was nationalized. According to the district court's findings, it was the expropriation itself that caused the nonpayment of the debts to defendants. The court found that "[o]n or after August 6, 1960, Cuban Electric was incapable of discharging its debts to [defendants] *because of* the expropriation of its assets by enactment of Resolution No. 1." (Findings at 4; emphasis added.) Under the "clearly erroneous" standard set by Fed.R.Civ.P. 52(a), we cannot properly disturb this finding of fact since it is certainly "plausible in light of the record viewed in its entirety." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). There was uncontradicted evidence that Cuban Electric had a net worth of $72,613,220 on December 31, 1959, five weeks after its initial default.

There is no evidence that it was insolvent when formally expropriated some seven months later.

Moreover, even if Cuban Electric had been insolvent when it was nationalized, this would not necessarily have meant that Cuba's action caused defendants no injury. Defendants were injured so long as assets existed after the nationalization to pay creditors some percentage of their claims. We note that a mere 39% liquidating or reorganization dividend would have sufficed to pay each defendant more than the amount of its offset here. For these reasons, Banco Nacional's lack-of-injury argument must be rejected.

CONCLUSION

The judgments of the district court ordering that, in light of defendants' defensive counterclaims, Banco Nacional take nothing on its successor claims, are affirmed.